# Wheeling.

## SWEENEY v. BAKER et al.

### Decided April 27, 1878.

1878
Special Term.

1. If a declaration in a libel suit set forth, in what is drawn in the form of one count, that the defendant on a given day published a libel against the plaintiff, containing in one part certain specified libelous allegations, and also containing in another part certain other specified libelous allegations of an entirely different character, this is nevertheless but one count, it being entirely formal, by the rules of the common law, to set forth in this manner all the libelous allegations published at one time.

2. To the two distinct libelous allegations, contained in such a count, distinct pleas could be filed.

3. Under our statute law no demurrer will lie in any case, because of duplicity in a declaration.

4. Under the 8th section of article 3 of the constitution of West Virginia, which provides, that "in prosecutions and civil suits for libel the truth may be given in evidence ; and if it shall appear to the jury, that the matter, charged as libelous, is true and was published with good motives and for justifiable ends, the verdict shall be for the defendant. HELD:

   I. The truth, and that the publication was made with good motives and for justifiable ends, can not be given in evidence under the general issue ; but if given in evidence under the plea of justification, they may, though not amounting to a full justification, be considered, either as a mitigation or aggravation, as the evidence may be strong or weak.

II. A general plea, that the libelous matter charged is true and was published with good motives and for justifiable ends, is not a good plea, where the libelous matter is a general charge.

1878
Special Term.
———
Sweeney
v.
Baker *et al.*

III. In such case the plea, to be good, must specify the particular facts, which show the general charge to be true; and must, unless the declaration shows it on its face, further allege the particular facts which show, that the end, for which the publication was made, was justifiable; and it would be insufficient, without so doing, to allege generally, that the motives were good and the end justifiable.

IV. These rules apply equally to suits for common law, to libels, and to statutory suits for the publication of insulting words.

5. A statutory suit for insulting words can be brought, though the words used were such, as would sustain a suit at common law, and though they were published or written.

6. A plea ought to be rejected, which is an allegation of the truth of a distinct portion of the libelous charges, contained in a count for a common law libel, and that it was published with good motives and justifiable ends, when the portion of the charge thus justified was not at common law libelous, as such portion of the charge inserted in the declaration must be regarded as surplusage. But such plea ought to be received, if pleaded to such a portion of the charges in a count in a suit, brought under the statute for insulting words, as no distinct portion of such charges can be treated by the court as surplusage.

7. An editor of a newspaper has no peculiar privilege of publishing, what is injurious to another. He can only publish with impunity that, which any other person would have an equal right to publish in a newspaper.

8. An editor of a newspaper, or any other citizen, has a right to publish in a newspaper any allegations, true or false, with good motives, or maliciously, in reference to the physical or mental qualifications of a candidate for an office in the gift of the people.

9. But if a publication be made in a newspaper of such a candidate with reference to his moral qualifications, which is libelous in its character, the party making such a publication may be held liable therefor in a suit for libel, unless he can prove the charges made to be true. It will not in such case be sufficient to prove, that the party publishing had good reason to believe, and did believe, them to be true, as a publication of

this character is not even conditionally privileged. From the publication of such libelous charges the law implies malice, as well as damages to the plaintiff; and the jury may therefore on proof of the publication only render a verdict for substantial damages.

10. Comments may be made in a newspaper on the acts or conduct of a candidate for an office, in the gift of the people, with impunity, if such comments are made *bona fide* and not maliciously, even though they be unjust, provided that the acts or conduct commented on are in fact, what they are represented to be in the publication.

11. There is copied by the clerk in the record a certificate, signed by the judge, stating, that a demurrer to a declaration had been filed and overruled by the court, but that the clerk had not entered the filing of the demurrer on the record. This memorandum is no part of the record.

12. If a rejected plea is by order of the court made[a part of the record, and the order book shows, that its rejection was excepted to, the Supreme Court of Appeals will review the action of the court in rejecting such plea, though no formal bill of exceptions was taken to the rejection of such plea.

13. If a motion in arrest of judgment and a motion for a new trial are made simultaneously, they may properly be both acted upon by the court; as under such circumstances the motion in arrest of judgment can not be regarded as an admission, that the verdict was unobjectionable.

14. Several pleas are filed, and several issues made on them, and the record states, that the jury was sworn to try the issue joined and find a verdict, which is responsive to all the issues ; and judgment is entered thereon. This court will not reverse such judgment, because of the manner, in which the record states the jury was sworn.

15. The record states, that a general replication is filed to a special plea, and issue joined. But no written replication appears in the record. This is no error, for which an appellate court will reverse a judgment entered on a verdict.

16. The Supreme Court of Appeals will not reverse the judgment of a circuit court, refusing to grant a new trial in a libel suit, because the damages are excessive, unless they are so enormous, as to furnish evidence of partiality, passion, corruption or prejudice on the part of the jury.

17. A new trial will not be granted, because a juror is alleged to have made up his mind on the merits of the case, before he was called on the jury; unless it appears from the whole case, that the party seeking the new trial suffered injustice from the fact, that such juror served.

Writ of error and *supersedeas* to a judgment of the circuit court of Ohio county, rendered on the 18th day of July, 1876, in an action of trespass on the case for libel, then in said court pending, wherein James W. Sweeney was plaintiff, and Lewis Baker, William J. Johnston, William H. Taney and James B. Taney were defendants.

Hon. Thayer Melvin, Judge of the first judicial circuit, rendered the judgment complained of.

GREEN, PRESIDENT, furnishes the following statement of the case:

James W. Sweeney at September rules, 1874, filed in the circuit court of Ohio county, his declaration in an action on the case for libel against Lewis Baker, William H. Taney, William J. Johnston and James B. Taney. The declaration consisted of three counts. The first count was as follows:

"James W. Sweeney, the plaintiff in this suit, complains of Lewis Baker, William H. Taney, William J. Johnston and James B. Taney, proprietors of the Wheeling *Register*, the defendants in this suit, who have been summoned to answer of a plea of trespass on the case for libel, for that, whereas the said James W. Sweeney is a good, true, honest, upright and worthy citizen of Ohio county, West Virginia, and as such has always behaved and conducted himself, and until the committing of the several grievances and injuries as hereinafter mentioned, was always reputed, esteemed and accepted by and amongst his neighbors, acquaintances and other good and worthy citizens, to whom he was in anywise known, to be a person of good name, fame, credit and morals, of honest demeanor and conduct, at Ohio county. And whereas, also, the said plaintiff hath not ever been guilty, or until the time of the committing of the grievances by said defendants, as hereinafter mentioned, been suspected to have been guilty of the offenses and miscon-

21

1878
Special Term.
Sweeney
v.
Baker *et al.*

duct, hereinafter mentioned to have been charged upon and imputed to him by the said defendants, or of any other offenses or misconduct, by means of which said several premises the said plaintiff, before the committing of the several grievances, hereinafter mentioned, had deservedly obtained the good opinion and credit of all his neighbors and other good and worthy citizens of said county and State, to whom he is in anywise known, at Ohio county aforesaid. Yet the said defendants, well knowing the premises, but greatly envying the happy state and condition of the said plaintiff, and contriving, and wickedly and maliciously intending, to injure him in his said good name, fame, credit and morals, and to bring him into public scandal, infamy and disgrace with and amongst all his neighbors, acquaintances and other good and worthy citizens of said county and State, and to cause it to be suspected and believed by those neighbors, acquaintances and citizens, that the said plaintiff had been, and was, guilty of the offenses and misconduct, hereinafter mentioned, to have been charged upon and imputed to him by the said defendants, and to vex, harass and oppress him the said plaintiff, on the 15th day of October, 1873, at the county aforesaid, falsely, wickedly and maliciously, did compose and publish, cause and procure to be published, and print and cause and procure to be printed, of and concerning him, the said plaintiff, in the Wheeling Daily *Register,* a newspaper owned, controlled, managed, printed and published by the said defendants in the said county, a false, scandalous, malicious and defamatory libel, containing amongst other things in one part thereof, the false, scandalous, malicious, defamatory and libelous matter following, of and concerning the said plaintiff, that is to say : ' The laboring men are taught to believe that a certain candidate,' (meaning thereby the plaintiff, James W. Sweeney, who was at that time a candidate to represent the county of Ohio in the House of Delegates of the State of West Virginia), ' who never did an honest day's work,'

(meaning thereby that the said plaintiff never did an honest day's work), 'is their especial champion and friend,' and also containing in another part thereof, the false, scandalous, malicious, defamatory and libelous matter following, of and concerning the said plaintiff, that is to say: 'A professional gambler,' (meaning thereby the plaintiff, James W. Sweeney, was a professional gambler); ' he preaches morality; and a confessed ignoramus, he argues that intelligence should control the election,' thereby meaning to insinuate, charge and cause to be believed, that the plaintiff had been guilty of gambling, had made gambling a profession, and obtained his means of livelihood, sustained sustenance and support thereby, and was publicly and confessedly known to be a man of great ignorance. By the means of the committing of which said several grievances by the said defendant as aforesaid, the said plaintiff has been and is greatly injured in his good name, fame and credit, and brought into public scandal, infamy and disgrace with and among all his neighbors, acquaintances and other good and worthy citizens of said county and State, insomuch that divers of these neighbors, acquaintances and citizens, to whom the innocence and honesty of the plaintiff were unknown, have on account of the committing of the said grievances aforesaid by the said defendants as aforesaid, from thence hitherto suspected and believed, and still do suspect and believe the said plaintiff to have been, and to be, a person guilty of gambling, of confessed ignorance, and to have never done an honest day's work in his whole life, and to have been, and to be, a person of bad character, morals and repute, and have by reason of the committing of the said grievances by the said defendants as aforesaid, from thence hitherto wholly refused, and still do refuse, to have any transaction, acquaintance and discourse with the said plaintiff, as they were before used and accustomed to have, and otherwise would have had, and also by means of the premises, the said plaintiff hath been and is otherwise greatly injured and damnified, to-wit:

At the county aforesaid, to the damage of the said plaintiff of twenty-five thousand dollars.".

The second count, after an indictment substantially the same as in the first count, in the same manner and form of charging, as in the first count, alleges the publication by the defendants maliciously in the Wheeling Daily *Register*, of October 16, 1873, of a libel, as follows: "Let the people of Ohio county not select a representative from the prize ring or gambling den;" and also containing in another part thereof the false, scandalous, malicious and defamatory matter following of and concerning the said plaintiff, that is to say: "Club-law is what we may expect from the Jimsweeney style of legislation;" also in another part, &c., "The noble game of draw poker is a candidate for popular suffrage to-day. It runs on the same ticket with the manly art of fist and skull;" and also in another part, &c.: "As a political argument, the fist of the bully and the kit of a gambler are not entirely satisfactory;" and also in another part, &c.: "Bullies and black-legs are supposed to be an inevitable evil, the buzzards and body-snatchers of society;" and also in another part: "When the bully and black-leg presents his personal and professional issue for approval at the polls, it is safe to presume that the intelligence and respectability of the community will decide it to his satisfaction;" and also in another part, &c.: "The laboring men of Wheeling are asked to vote for a man, who never earned an honest penny, or did a stroke of labor in his life. Honest industry loathes such association. Vote for Pannel;" also in another part, &c.: "Would you select a man to make laws, whom you would kick out of your house, and would not trust in your hen-coop? Certainly not. And yet by staying at home to-day you give half a vote to just such a man. Go to the polls and vote for Pannel;" and also in another part, &c.: "No man in the community has any interest in seeing the county disgraced by sending a social leper to speak and act for him in public councils;" and also in

another part, &c. : "It is as much the duty of the citizen to vote against Jimsweeney as it would be to deodorize against the cholera ;" and also in another part, &c. : "We are not disposed to believe that Ohio county people are going to vote to-day for rowdyism or the pimpery of the faro-bank ;" and in another part, &c. : "If Jimsweeney can be sent to Charleston, he might be induced to take a faro kit with him, and relieve the tedium of legislation with the ennobling diversion, which has brought such bright laurels to his brow ;" and also in another part, &c.: "Not now for the first time do we summon the people of the county to cast their ballots against the boozing ken, the sweat cloth, and the bagnio." And there was addded to each of these statements an innuendo declaring, that it was intended to be applied to the plaintiff, and thereby meant severally, that he was "a gambler, a prize-fighter, a bully, a rogue, a rowdy, one concerned. in interest in keeping a faro bank, a drunkard and a whoremaster"— and it concluded substantially like the first count.

The third count begins substantially like the others, except that it further alleges, that the defendants intending "to provoke him to commit a breach of the peace published on October 16, 1873, in the Wheeling Daily *Register* a libel, setting it forth as in the second count, except that only a portion of the libelous matters named in it is set forth in this third count, and the count and declaration then concludes as follows : "By reason of the composing and causing to be composed, of the publishing and causing to be published, of the printing and causing to be printed, of which said false, scandalous, malicious and defamatory libel, the plaintiff has been injured and has sustained damages to the amount of $25,000.00, and therefore he brings suit, &c."

"On November 14, 1874," the record states, "the parties came by their attorneys, and the defendants tendered their three special pleas in writing, number one, two and three, one to each count of the declaration, which said several pleas are in the words and figures following,

to-wit: And the plaintiff thereupon objected to the filing of each of said pleas, and the court sustained the objection, and refused to allow either of said pleas to be filed, to which ruling of the court the defendants then and there excepted. The three pleas are then copied in the record, presented to this court, and are all exactly alike, except that they are filed one to each count of the declaration. The first of these pleas is in these words: .

"And the said defendants for further plea in this behalf say, that the matters charged as libelous in the first count of the plaintiff's declaration are true, and they further say, that said matters were published by the defendants in said newspaper with good motives and for justifiable ends. And this the said defendants are ready to verify. Wherefore they pray judgment, &c."

On May 31, 1875, the following entry was made of the action of the court at that time:

"This day came the parties, by their attorneys, and thereupon the defendants tendered seven special pleas in writing, to the filing of each of which the plaintiff, by his counsel, objected, on the ground that said pleas were tendered too late, and on the further ground that said pleas are not sufficient in law to constitute a defense in this action; and the court sustains the latter of said objections as to the fourth of said pleas, and rejected the said plea, to which ruling the defendants excepted, and pray, that their said exception may be made a part of the record, which is accordingly done; but as to the others of said pleas, and each of them, the court overrules the plaintiff's objections, and allows the said pleas to be filed, to which ruling of the court and the filing of said pleas, and each of them, the plaintiff, by his counsel, excepted, and prays that his said exceptions may be made a part of the record, which is accordingly done; and thereupon the plaintiff, by his counsel, moved the court to strike out of each of the first, second and third of said pleas all the allegations of fact, therein contained, prior to the allegation respecting the plaintiff's action at Blacks-

burg in the state of Virginia; but the court overruled said motion, to which ruling of the court, the plaintiff, by his counsel, excepts, and prays, that his said exception may be made a part of the record, which is accordingly done; and thereupon the plaintiff, by his counsel, replies generally to each of the special pleas filed in this action."

The six special pleas, allowed by this order to be filed, were all of them pleas of justification to the alleged libels, in each of the three counts of the declaration; and they specify the facts, which, the defendants say, constitute their justification. Among the facts so set forth, as such justification, are the following: That he, plaintiff, was a professional gambler in this, that he did on several occasions, specified particularly, and at divers other times, play at the game of " faro " and " poker," and bet on them, and won and lost thereon large sums, exceeding twenty dollars in a day. There are four faro banks or places of gambling in Wheeling, and three in Charleston specified, where the plea alleges, that the plaintiff, at specified times and on divers other occasions, thus gambled. And they further allege, that at different times, specified, both at Blacksburg and Giles Court-House, the plaintiff was the proprietor of rooms, wherein he habitually and professionally dealt faro, at which others were allowed to bet; and that he, the plaintiff, gained a part of his livelihood by such gambling; and that for a long time he followed no other business or way of making a livelihood.

One of these pleas justifies the allegation, that the plaintiff was a bully; and, to sustain the allegation of this character, specifies, that at certain specified times and places the plaintiff made several unprovoked assaults on sundry named persons, and did beat and wound them at different times, specifying three, such occasions, on one of which he shot without provocation another party. And the pleas further specify another occasion, on which the plaintiff did pro-

cure and compel without cause two other specified persons to fight. And another of these pleas justifies the allegation, that the plaintiff was a whoremaster, by asserting, that on October 10, 1873, and for a long time previous thereto, the plaintiff had been in the habit of visiting the house of a certain named person, who kept a house of ill-fame, or bagnio, at a certain place in Wheeling, and was in the habit of associating with lewd women, the inmates of this house of ill-fame.

There was no bill of exceptions taken to the rejection of the fourth special plea; but the clerk has copied it in the record presented to this court. It is in these words :

"And the said defendants, for further plea in this behalf, as to the composing, printing and publishing of the several matters and things of and concerning the plaintiff, contained in the first count of the plaintiff's declaration charging the said plaintiff with being 'a confessed ignoramus,' by leave first had, say, that the said plaintiff ought not to have or maintain his aforesaid action thereof against them because they say, that the said plaintiff, at the time of the said publication of the said words and things, to-wit: on the fifteenth day of October, 1873, and for a long time previous thereto, was a confessed ignoramus in this, to-wit : that he the said plaintiff did heretofore to-wit: on the 1st day of June, 1873, and at divers other times before and after that time, and before the publication aforesaid, to-wit: at said county, in a conversation then and there had with one O. S. Long and divers other persons unknown to these defendants, vainly pretend to be learned in the arts, sciences and English composition. And the said defendants in fact say, that the said plaintiff was, at the times of holding the said several conversations as aforesaid, ignorant of and was not learned in the arts, sciences and in English composition, but only had a mere superficial and imperfect knowledge of the matters aforesaid, and was not learned in the same. And the said defend-

ants further say, that it was generally known by persons of learning and scientific attainments, who were acquainted with the said plaintiff, and also known and admitted by his intimate friends and acquaintances, that he, the said plaintiff, was a vain pretender to a knowledge of the arts, sciences and English composition, as aforesaid. Wherefore the said defendants say, they were justified in composing, printing and publishing the words and things aforesaid in the first count of the said declaration mentioned. And this they are ready to verify. Wherefore the said defendants pray judgment, &c."

On June 1, 1875, the cause was continued for the defendants on account of the absence of five witnesses, named in the affidavit for a continuance. The other continuances were general continuances. On May 15, 1876, the plea of not guilty was filed, and issue joined thereon; and the cause being tried was submitted to the jury, who the next day rendered a verdict for the plaintiff, and assessed his damages at $8,000.00. The record says, that this jury were sworn, the truth to speak on the issue joined.

The defendants on May 3, 1876, moved in arrest of the judgment, and also for a new trial, which motions were overruled July 18, 1876, and judgment rendered for the plaintiff according to the verdict of the jury; and the defendants took a bill of exceptions to this action of the court, which sets forth the facts proven. The bill of exception is as follows:

"Be it remembered, that on the trial of this cause, after the jury were sworn, but before any evidence was submitted to them, the counsel for the plaintiff and defendants, respectively, stated to the jury what they expected to prove, and in such statement, on behalf of the defendants, their counsel called attention to the special pleas filed by defendants, recapitulated to the jury the allegations of said pleas, and insisted that such allegations would be proved by evidence.

22

" Thereupon, the plaintiff proved that the defendants were the proprietors and publishers of the Wheeling *Register*, a daily and weekly newspaper, during the year 1873; that the said defendants published on October 15 and 16, 1873, issues of said newspaper; that they published, distributed and circulated in the neighborhood of twelve or thirteen hundred copies of the issue of each of those dates of which two or three hundred were sent to regular mail subscribers outside of this county, and a few to exchanges and subscribers outside of the State.

" At that time A. J. Pannell and the plaintiff were prominent candidates for election to the House of Delegates from Ohio county.

" In the issue of said daily paper of October 15, 1873, defendants published the following : ' The laboring men are taught to believe that a certain candidate who never did an honest days' work, is their especial champion and friend.' 'A professional gambler, he preaches morality ; and a confessed ignoramus, he argues that intelligence should control the election.'

" In the issue of said daily paper of October 16, 1873, defendants published the following : ' Let the people of Ohio county not select a representative from the prize ring or the gambling den.' ' Club law is about what we may expect from the Jimsweeney style of legislation.' ' The noble game of draw-poker is a candidate for popular suffrage to-day, it seems, on the same ticket with the manly art of fist and skull.' ' As a political argument the fist of the bully and the kit of the gambler are not entirely satisfactory.' ' Bullies and blacklegs are supposed to be an inevitable evil, the buzzards and body snatchers of society.' ' When the bully and blackleg presents his personal and professional issue for approval at the polls, it is safe to presume, that the intelligence and respectability of the community will decide it to his satisfaction.' ' The laboring men of Wheeling are asked to vote for a man who never earned an honest penny or did a stroke of labor in his life. Honest industry

loathes such a man. Vote for Pannell.' 'Would you select a man to make laws, whom you would kick out of your house and wouldn't trust in your hen coop? certainly not, and yet by staying at home to-day you give half a vote for just such a man. Go to the polls and vote and work for Pannell.' 'No man in the community has any interest in seeing the county disgraced by sending a social leper to speak and act for her in public councils.' 'It is as much the duty of the citizen to vote against Jimsweeney to-day, as it would be to deodorize against cholera.' 'We are not disposed to believe that Ohio county people are going to vote to-day for rowdyism or the pimpery of the faro bank.' 'If Jimsweeney can be sent to Charleston, he might be induced to take a faro kit with him, and enliven the tedium of legislation with the ennobling diversion, which has brought such bright laurels to his brow. Not now for the first time do we summon the people of this county to cast their ballots against the boozing ken, the sweat cloth and the bagnio.'

"In the issue of said daily paper of January 15, 1873, defendants published the following:

'We noticed in the Charleston papers the arrival in that city of Thomas P. Shallcross, Esq., and Maj. Jimsweeney chronicled. Matters pertaining to the management of the Penitentiary are supposed to occupy their attention. If our distinguished fellow-citizen, Jimsweeney, is not rewarded by Mr. Jacob with the position he seeks, it will be báse ingratitude, for no man in all the region roundabout lied harder, swore more unscrupulously or did dirt more magnificently for Jacob and Radicalism last summer than this self-same Vesuvius.'

In the issue of said daily paper of April 30, 1873 defendants published the following:

'Jimsweeney, the chief of the 'Ritchie Cabinet,' has been in a great state of excitement this last few days. He flies around like unto the legendary perfumed air in a skillet. The occasion of all this is the coming of the man he 'runs.' "

"All the matter so published referred to plaintiff.

"And the defendants rested without offering any evidence.

"The foregoing being all the facts proven, the jury found for the plaintiff, and assessed his damages at $8,000.00.

"The defendants thereupon said, that the court ought not to proceed to judgment on said verdict, and also moved the court to set aside said verdict and grant them a new trial, on the ground that the verdict was contrary to the evidence, that the damages were excessive, and on the ground of the misconduct of jurors; and in support of said motion the defendants filed sundry affidavits; and the plaintiff in opposition to said motion, sundry affidavits; and sundry counter-affidavits were also filed. And thereupon the court overruled the said motion of the defendants, and rendered judgment on said verdict, to all of which the defendants then and there excepted, and prayed that this their bill of exceptions should be signed and sealed by the court, which is accordingly done; and the same is ordered to be made a part of the record of said cause.

" T. MELVIN."

The affidavits referred to are those of John W. Schultz, a magistrate, who says, that on or about May 15, 1876, he in his own office had a conversation with Saunders, a juror, about some work, he wanted him to do. He said he would do the work probably on the following Monday, as the Sweeney case would come up, and "they could not use him as a juror, as he had his mind made up on that subject," or words to that effect. On Monday following he met this juror, when he said to him: " I don't know what they want with me on that jury; I have my mind made up. I don't see the reason, why the judge did not ask me, whether I had formed an opinion," or words to that effect. After the verdict was rendered, he said to him, there were men on the jury, who valued

their reputation at $6,000,000.00; and when he asked him who these jurors were, he indicated himself.

The affidavit of W. H. Combs, a constable, is also filed, who says, he heard this juror say, he would do some work for Schultz on Monday, May 15th, 1876; that he would not be on the jury that day, as Sweeney's case was coming up. 'Squire Schultz asked him, why he would not be on the jury. He said in reply: his mind was made up.

The affidavit of James B. Taney, one of the defendants, was filed. He said that none of the defendants are or were acquainted with the juror, Saunders; and that he is informed, and believes, that they have been prejudiced by this juror being on the jury, he not being a fair and impartial juror; that Saunders was very much prejudiced against them, before the trial of the suit, and so expressed himself on the day of the trial; that he and the other defendants supposed him to be a fair and impartial juror, from the fact of his being examined under oath touching his fitness as a juror; and they had no other belief in relation to this juror till after the trial of the cause; that said Saunders remained on the jury, from gross ignorance of the oath taken by him, or from corruption, and that in either case he was unfit to sit as a juror.

The affidavits, filed in opposition to them, were the affidavits of the juror Saunders, who says, he never had any acquaintance with the defendants or any of them, nor had he had at any time any bias or prejudice against them or any of them, either concerning anything involved in this suit, or anything else, nor did he ever so express himself. He admits, he had a conversation with Schultz on May 13th, 1876, and that he agreed to do some work on Monday, the 15th of May, 1876, if he should not be required to serve on the jury on that day; but he has no recollection of speaking of this case, and did not say, they could not use him for a juror, as he had his mind made up on that subject, or that he had formed

or expressed any opinion upon it; he had never known, or heard, that Mr. Sweeney had brought a suit of this nature, or if he had, he had utterly forgotten it, until the case was called at the then term of the court; he did not know anything about the nature of the suit, then, nor until he was sworn upon the jury; that he did not form or express an opinion on the case, until the case was given to the jury; that he did not say to Mr. Schultz, or any one else at any time, "that he did not know, what they wanted him on that jury, he had his mind made up. He don't see the reason, why the judge did not ask him, whether he had formed an opinion," or words to that effect. He did not say to Schultz after the verdict, that there were men on the jury, who valued their reputation at $6,000,000.00, and indicate that the juror was himself; but he did say in a joking way, that he valued his reputation at $6,000,000.00.

Charles Klevis in his affidavit says, that he was in Schultz's office at work on May 13, 1876; that he heard the juror, Saunders, talking with Schultz about doing some work for him on Monday, the 15th of May, 1876; but he said nothing about the Sweeney case in that conversation. But he states in a subsequent affidavit, that he is a German, and does not understand the English language very well, and the conversation between Schultz and the juror, Saunders, was in English; and there was other conversation between them, that he did not hear or understand.

Sweeney, the plaintiff, swore, that, when the jury was about to be selected, Schultz was present, when he, plaintiff, and his counsel were examining the jury list, and seemed to manifest more interest in it, than was proper, and was closer to them than propriety required, and he having reason to believe from past occurrences, that he was there, in the interest of the defendants, ceased conversing about the jury list, till he left that part of the court room.

Schultz says in a second affidavit, that he attended the

trial as a witness for the plaintiff, and that he had no reason to believe, he was there in the interest of defendants; that he had no difficulty with the plaintiff; and, so far as he knew, there was no ill feeling between them; they had only differed politically; that he regards the plaintiff as a gentleman, and a man of honor; that he and Mr. Baker are not good friends, he had abused him in his paper.

Strobel in his affidavit says, he heard juror Saunders, when he said he would not take $6,000,000.00 for his reputation. He afterwards said in the same conversation, the judge had not asked him, whether his mind was made up or not. Schultz said to him: Did not the judge ask you if you were biased or prejuiced? and Saunders said, he did not, or if he did he did not hear, or did not understand it.

Sweeney, the plaintiff, says in a sworn affidavit, that when Schultz approached, while he was examining the jury list, twenty jurors were in the box, Saunders being one of them, and one or more of the defendants were with their counsel, in a few feet of them; and he states, that he had Schultz summoned, to compel him to testify to certain facts with reference to Baker, which he knew, and for no other purpose. The other matters contained in the affidavits are immaterial.

The copy of the record presented to this court is closed by the following certificate:

"It is hereby certified, that a demurrer was entered by the defendants to the plaintiff's declaration and to each count thereof, at the May term, 1875, and after the tendering of special pleas, some of which were, when tendered, allowed to be filed, but without entry thereof until May 31, 1875; and others were rejected, but being amended, were re-tendered and allowed to be filed, which filing appears by the order of May 31, 1875; but the plaintiff objected to the hearing of said demurrer, on the ground that it came too late. The court, without disposing of said objection, overruled said demurrer at the same term,

at which it was offered. No record of said demurrer was made by the clerk. It is further certified, that the setting aside of the office judgment and the filing of the plea of not guilty, which do not appear of record until May 15, 1876, were in fact done at the first term, at which the cause was upon the docket.

"This certificate is made at the instance of the defend-. ants, and against the protest of the plaintiff, to have such effect as the Court of Appeals may deem it entitled to.

"T. MELVIN, *Judge, &c.*"

A certificate is added at the end by the clerk of the court, that the foregoing is a true transcript of the record and papers in. said cause as fully and wholly, as the same remain among the records of his office.

From the action of the circuit court on July 18, 1876, overruling the motions in arrest of judgment and for a new trial, and rendering judgment according to the verdict of the jury, the defendants applied for, and obtained from this court, a writ of error and *supersedeas.*

*W. W. Arnett,* of counsel for plaintiffs in error, cited the following authorities :

Acts of 1872-3, p. 107, §23 ; 5 W. Va. 380 ; 4 W. Va. 203 ; 3 W. Va. 639 ; 2 W. Va. 60 ; 1 Gilen, p. 659, §6 ; Hilliard on New Trials, pp. 141, 142 ; 4 H. & M. 16, 200, 219 ; Code of W. Va. p. 627, §15 ; 4 W. Va. 203 ; U. S. Digest 1874, p. 560 (Drunkenness); Townsd. on Slander §§56, 59, 69, 108, 160, 174, 187, 197, 279, 280, 293 and note ; *Id.* pp. 337, 338 ; 22 Barb. 87 ; 4 W. Va. 206 ; 4 Gratt. 422 ; Kent Com. Lect. 24, and cases cited ; 5 Jones 508 ; 6 Leigh 299 ; 3 Call 232 ; 3 H. & M. 449.

*R. G. Barr,* of counsel for plaintiffs in error, cited the following :

6 Leigh 299 ; 3 H. & M., 449 ; 3 Call 232 ; 7 Leigh 267 ; Constitution Art. III, §8 ; Acts 1872-3, ch.

47, §23 ; 4 W. Va., 629 ; Hilliard on New Trials p. 175, §32 ; *Id.* pp. 578, 583 and cases cited ; Code of W. Va. p. 545, §1 ; 1 Rev. Code Va. ch. 157, §8; Code 1849, p. 589, ch. 148, §2; *Id.* p. 669, ch. 176, §44; 16 Gratt. 86 ; 1 Caines (N. Y.) 347; 3 Caines (N. Y.) 329 ; 1 Chit. Pl. 405 ; 1 Caines, 581 ; *Id.* 583; 15 Johns. 318 ; Gould Pl. ch. 4, §99, p. 219 ; *Id.* ch. 4, §79, p. 210 ; Co. Litt. 304 a. ; 3 Black. Com. 311; Bac. Abr. Pleas &c., H. pp. 1, 2, 3; *Id.* H. pp. 1, 5 ; Co. Litt. 126 a; 1 Stra. 317 ; Bull. N. P. 93 ; 1 Burr. 316, 321 ; Tidd (9th ed.) 661, 694, 1174 ; Com. Dig. Pléader 16 ; *Id.* Abatement C. & I. 3, 4 ; 1 Chit. Pl. 226 ; Steph. (2d ed.) 292 ; 2 Saund. Pl. 49. 50 ; 16 Gratt. 80 ; 6 Gratt. 538 Townsd. on Slander §§57, 70, 146, 147, 148, 187, 190 291 ; 2 Johns. 115 ; 1 Va. Ca. 179.

*James M. Morrow, Jr.,* of counsel for plaintiffs in error, cited the following :

Gilmer 228, 338; 1 Chit. Pl. (13 Am. ed.) 605 606; 3 Rand. 59 ; Constitution 1863 Art. II., §5; Kent's Com. Lect. 24, and cases cited ; 5 Johns. 508; 2 Tucker's Com. 287; 30 Ill. 373 ; 31 N. H. 496 ; 14 Ohio 233 ; Sedg. Meas. Dam. (6th ed.) 762 *et seq.* and note and cases cited.

*William W. Gordon,* of counsel for plaintiffs in error cited the following :

6 T. R. 8 ; 4 Mod. Rep. 371 ; 12 Mod. Rep. 384 ; 5 Burr. 27, 30 ; 3 Cow. 39, 42 ; 6 Me. 48 ; *Id.* 415 ; 18 Me· 183 ; 10 Me. 278; 37 Me. 234; 8 Ga. 465 ; 3 H. & M. 449 ; 20 How. 428 ; 23 Ohio 578 ; 3 Bosw. (N. Y.) 200 ; 4 Rob. Prac. 721 ; 5 Johns. 436 ; 6 Wend. 411 ; 8 Watts 303 ; 7 Pet. 142 ; 2 McLean 433 ; 14 Conn. 487 ; 3 Black 307 ; 12 Wheat. 460 ; 3 S. & M. 60 ; 2 Root 302 ; 34 Conn. 290, 294; 4 Miss. (3 How.) 27 ; Hard. (Ky.) 167 ; 3 Bibb (Ky.) 347 ; 4 Bibb 191 ; 1 B. Mon. 213 ; 20 Conn. 238 ; 28 Vt. 356 ; 2 Swift's Dig. 415, 705 ; 2 N. Benl.

942 ; Comb. 357 ; 3 Kan. 248 ; Starkie on Slander 163 ;
-48 Ala. 15 ; Tidd's Prac. 909 ; 2 Penn. 433 ; 1 Bl. R.
464 ; 21 Ill. 188 ; 22 Mo. 171 ; 36 Cal. 462.

*E. G. Cracraft,* of counsel for defendant in error, re-
lied on the following authorities :

3 Co. Litt. 323 ; 2 Tuck. Com. 327 ; 1 H. & M. 25 ;
2 H. & M. 477 ; 3 Leigh 78 ; Code 1868 ch. 103, §2 ; 6
Gratt. 535 ; 17 Gratt. 255 ; 1 Am. Lead. Cas. 123 ; 48
N. Y. 472 ; 9 Wis. 493 ; 28 N. Y. 325 ; 2 Wh. Co. Ca.
26 ; 3 W. Va. 629 ; 16 Pick. 547 ; Stark. on Slander
380, 388, 443, 400, 404 ; 4 N. Y. 165 ; 2 Cr. Cas. 36, 37,
Code 1868 ch. 134, §3 ; Townsd. on Slander §§334, 347 ;
Grah. & Wat. on New Trials. 126, 128, 129.

*W. P. Hubbard,* for defendant in error :

*First*—The judge's certificate as to demurrer is no
part of the record. *Cunningham* v. *Mitchell,* 4 Rand.
189 ; *Bowyer* v. *Chestnut,* 4 Leigh 4.

*Second*—The rejected plea is not part of the record.
Being rejected it could only become part of the record
by bill of exceptions, or express order of the court.
*White* v. *Toncray,* 9 Leigh 347 ; *Morrissett's case,* 6 Gratt.
673.

The action of the clerk in placing the plea in the rec-
ord avails nothing. *Cunningham* v. *Mitchell,* 4 Rand. 189 ;
*Bowyer* v. *Chestnut,* 4 Leigh 4.

*Third*—The circuit court did right in refusing the mo-
tion for a new trial :

1. The words published were actionable *per se,*
(Townsd. on Slander and Libel, §§59, 147, 176, 177, 178 a.)

2. As to misconduct of a juror (or rather his alleged
expression of opinion) :

A.—The affidavits, including that of Saunders, the
juror complained of, (which is admissible to sustain the
verdict,) disprove the allegations of his misconduct.
1 Graham & Watterman on New Trials, pp. 129, 130.

*Conwell* v. *Anderson*, 2 Carter (Ind.) 122; *State* v. *Ayer*, 3 Foster (N. H.) 301; *State* v. *Pike*, 20 (N. H.) 344; *State* v. *Shelledy*, 8 Clarke (Iowa) 477; *State* v. *Scott*, 1 Hawks (N. C.) 24; *Thompson* v. *Updegraff*, 3 W. Va. 629, 639, and cases there cited. See *Curren's case*, 7 Gratt. 622, and *Bristow's case*, 15 Gratt. 634.

B.—The affidavits against the juror only charge him with saying, that he had made up his mind, without saying in whose favor. Plaintiff would have as much right as defendant to complain of that expression. The verdict affords no evidence, what the prior opinion of the juror was, for every juror, no matter what his prior opinions may have been, was compelled to unite in a verdict for the plaintiff. If defendants' claim here be correct, we should have the curious spectacle of a case, in which there was one fact, which could be used by the beaten party, which ever it might be, to set aside the verdict.

If such a remark be ground for a new trial, a party hearing it would be induced not to challenge the juror, in the hope, that the opinion of the juror was in his favor, and would only make known the juror's remark in the event of an adverse verdict.

C.—It must be presumed, that the defendants knew all about Saunders, and what he said, if he said anything, and that they waived any objection to it. 2 Graham & Watterman, 474 to 476. The only attempt to show defendants' ignorance was the affidavit of J. B. Taney, which is unsatisfactory respecting his own knowledge. No attempt is made to show the ignorance of the other defendants, or of their counsel, respecting Saunders. The ignorance of all must be shown.

D.—The juror could have found no other verdict than he did. The conduct of the defendants in failing to introduce evidence was an agreement, that there must be a verdict against them, leaving as the only question the amount of the verdict; and upon that question it is not pretended, that the juror had expressed an opinion.

Some of the facts, which ought to have led the jury to a large verdict, occurred after the jury was sworn.

E.—The record does not show, that the juror was questioned on his *voir dire*; and in that case the verdict will not be set aside for his expressing an opinion before trial. *Byars* v. *Mt. Vernon,* 77 Ill. 467 ; *State* v. *Shelledy,* 8 Clarke (Iowa) 477.

F.—The Legislature (acts 1872-3, chapter 47, §23), took out of §17, of chapter 116, of the Code, the provision, that the expression or formation of opinion by a juror should disqualify him, upon challenge.

G.—No injustice has been done defendants in this case; and the court should not interfere with the verdict. 2 Graham & Watterman 465; *Jones's case,* 1 Leigh 616; *Campbell* v. *Lynn,* 7 W. Va. 665.

H.—The court below has refused a new trial. Its ruling on these affidavits will not be inquired into here, and is conclusive. *State* v. *Godwin,* 5 Ired: 401 ; *Heath's case,* 1 Rob. 735, 742.

4. The damages are not excessive. Where actual ill will is shown, jury may give exemplary or vindictive damages. Townsd. §290; and cases there cited.

A.—Express malice was proved by the former publications. Townsd. §§392, 394 ; *Hansbrough* v. *Stinnett,* 25 Gratt. 505.

B.—It is proved by the language of this libel itself. Townsd. §399.

C—The obtaining of a continuance by defendants' affidavit of the absence of material witnesses (Rec. p. 38), when no witnesses were afterwards called upon the trial, shows malice.

D.—The first attempt to justify in pleading and its partial abandonment show malice. Townsd. §400.

E—The opening of the case by defendants' counsel before the jury, the reiteration of the charges made by the pleas, alleging their truth, promising to prove them, and then offering no evidence, afford the strongest proof of malice. Townsd. §§400, 392.

F.—The circuit court, having refused to set the verdict aside, it does not seem to be a case, in which this court should interfere. *Nadenbousch* v. *Sharer*, 4 W. Va. 206, 208 ; *Young* v. *Hairston*, 3 Dev. 55 ; *McRae* v. *Lilly*, 1 Ired. 118. On the question of excessive damages, see Hilliard on New Trials, pp. 431, 432, 434 to 436, 446 ; 2 Graham & Watterman, pp. 410, 426, 427, 433, 434.

5. But the detendants' motion for a new trial is of no avail, because it was superseded and overruled by their motion in arrest of judgment. *Smith* v. *Porter*, 5 Ind. 429 ; *Chrisman* v. *Melne*, 6 Ind. 487 ; *Sims* v. *Alderson*, 8 Leigh 479.

*Daniel Lamb*, of counsel for defendant in error, cited the following :

20 How. (U. S.) 439 ; 23 Ohio 578 ; 17 Wall. 409 ; 2 Rob. (New Prac.) 614, 615 ; 17 Gratt. 250 ; 2 Add. on Torts (1876) 926, 930 ; 1 Am. Lead. Ca. (5th ed.) 125 *et seq.*; 4 Rob. (New Prac.) 691, 692 ; 55 Eng. C. L. 861, 862 ; 2 Wms. Saund. 171 d, 307 c ; 1 Chit. Pl. (6th ed.) 435 and form 2; *Id.* 632 &c. ; *Id.* 261 ; 10 Gratt. 257 ; 28 Conn. 86 ; 9 Leigh 347 ; 2 Gratt. 193 ; 6 Gratt. 674 ; 8 W. Va. 260 ; 1 Wall. 598, 600 ; 8 Wall. 357 ; 11 Gratt. 722 ; 3 B. & C. 427 ; 2 Add. on Torts (1876) 992 ; 45 N. Y. 398 ; 32 Eng. C. L. 166 ; 114 Mass. 103; 2 Gray 281 ; 34 Conn. 294, 295 ; 23 Ohio 333 ; 15 Gratt. 645, 650 ; Stark. Ev. (1869) 825, 826 ; 1 Phil. Ev. (1859) 469 ; 1 Greenl. Ev. §200 ; 11 Gratt. 336, 337 ; 2 Pat. & H. 632 ; 3 W. Va. 639, 644 ; 14 Ga. 709 ; 1 Rob. 742, 743 ; 12 Gratt. 698, 699 ; 1 Cl. & Fin. 224 ; 15 Ohio 298 ; 27 Ohio 44 ; Code W. Va. pp. 637, 638, 648 ; 4 Rand. 161 ; 11 Gratt. 823, 824 ; 12 Gratt. 55 ; 2 Chit Pl. (6th ed.) 632, 633 ; 55 Eng. C. L. 841 ; 62 *Id.* 591 ; 4 Rob. (New Prac.) 721, 722 ; 10 Co. 131 a ; 2 Wms. Saund. 171 d, 307 c ; 4 M & W. 206 ; Gould's Pl. p. 220 §99 ; *Id.* p. 466, §16 ; 1 Wms. Saund. 244.

1878.
Special Term.

Sweeney
v.
Baker *et al.*

GREEN, PRESIDENT, delivered the opinion of the Court :

Before considering directly the questions, involved in this case, I will briefly consider the rights and duties of the parties to this action, arising from their relations to each other.

Syllabus 7

The plaintiff was a candidate to represent the county of Ohio in the House of Delegates of the State of West Virginia; and the defendants were proprietors of the Wheeling Daily *Register*, a newspaper published in said county. A newspaper proprietor is just as liable, for what he publishes in his newspaper, as any other person ; and he is liable in the same manner and to the same extent. The law takes no cognizance of newspapers ; and there is no distinction between the publication by the proprietors of a newspaper, and a publication by any other person.

The terms "freedom of the press" and "liberty of the press" have misled some to suppose, that the proprietors, of a newspaper had a right to publish that with impunity, for the publication of which others would have been held responsible. But the proper signification of these phrases is, if so understood, misapprehended. The "liberty of the press" consists in a right, in the conductor of a newspaper, to print whatever he chooses without any previous license, but subject to be held responsible therefor to exactly the same extent, that any one else would be responsible for the publication.

In the case of *Stebbins et al. adm'rs* v. *Merritt et al.*, 10 Cush. 25, the instruction given by the court below, and approved by the Supreme Court, was : " It has been urged upon you, that conductors of the public press are entitled to peculiar indulgence, and have especial rights and privileges. The law recognizes no such peculiar rights, privileges, or claims to indulgence. They have no rights but such as are common to all. They have just the same rights, that the rest of the community have, and no more. They have the right to publish the truth, but no

<sup>r</sup>ight to publish falsehoods to the injury of others with impunity."

In *Davidson* v. *Duncan*, 7 El. & Bl. 231 (90 Eng. C. L.) Coldridge, J., says: "There is no difference in law, whether the publication is by the proprietor of a newspaper, or by some one else. There is no legal duty on either to publish, what is injurious to another; and if any person does do so, he must defend himself on some legal ground."

But the fact, that one is a candidate for an office in the gift of the people, affords in many instances a legal excuse for publishing language concerning him as such candidate, for which publication there would be no legal excuse, if he did not occupy the position of such candidate, whether the publication be made by the proprietors of a newspaper, or by a voter, or other person having an interest in the election. The *conduct and actions* of of such candidate may be freely commented upon; his *acts* may be canvassed, and his *conduct* boldly censured. Nor is it material, that such criticism of *conduct* should in the estimate of a jury be just. The right to criticise the *action* or *conduct* of the candidate is a right, on the part of the party making the publication, to judge himself of the justness of the criticism. If he was liable for damages in an action for libel for a publication criticising the *conduct* or *action* of such a candidate, if a jury should hold his criticism to be unjust, his right of criticism would be a delusion, a mere trap. The only limitation to the right of criticism of the *acts* or *conduct* of a candidate for an office in the gift of the people is, that the criticism be *bona fide*. As this right of criticism is confined to the *acts or conduct* of such candidate, whenever the *facts*, which constitute the act or conduct criticised, are not admitted, they must of course be proven. But *as respects his person* there is no such large privilege of criticism, though he be a candidate for such office.

This large privilege of criticism is confined to his *acts*. The publication of defamatory language, affecting his

moral character, can never be justified on the ground, that it was published as a criticism. His talents and qualification mentally and physically for the office, he asks at the hands of the people, may be freely commented on in publications in a newspaper, and though such comments be harsh and unjust, no malice will be implied; for these are matters of opinion, of which the voters are the only judges; but no one has a right by a publication to impute to such a candidate falsely crimes, or publish allegations affecting his character falsely.

In the *Commonwealth* v. *Clapp*, 4 Mass. 163, Chief Justice Parsons says : " When any man shall consent to be a candidate for public office, conferred by the election of the people, he must be considered as putting his character in issue, so far as it may respect his fitness and qualifications for the office ;" but he adds : " The publication of falsehood and calumny against public officers, or candidates for public offices, is an offense most dangerous to the people, and deserves punishment, because the people may be deceived, and reject the best citizens, to their great injury, and it may be to the loss of their liberties."

In *Mayrant* v. *Richardson*, 1 Nott. & M. (S. C.) 348, where the words, complained of, were spoken and written of a candidate for Congress, and were substantially, that his mind was so impaired and weakened by disease, that it could not be depended upon, though special damages were laid, yet the court held on demurrer, that the action could not be sustained, though the language used was false and malicious, though had the words used or letters written imputed a crime or moral delinquency, the action would have lain.

Justice Mott in delivering the opinion of the court says : " When one becomes a candidate for public honors, he makes a property of himself for public investigation. All his pretensions become the proper subjects of enquiry and discussion. He makes himself a species of public property, into the qualities of which every one has a right to enquire, and of the fitness of

which every one has a right to judge, and give his opinions. The ordeal of public scrutiny is many times a disagreeable and painful operation ; but it is the result of freedom of speech, which is a necessary attribute of free government; and the same may be said of freedom of the press."

The authorities fully sustain the position, that a publication in a newspaper made either of a public officer or of a candidate seeking an office from the votes of the people, which imputes to him a crime or moral delinquency, is not a privileged publication, either absolute or conditional ; but such a publication is *per se* actionable, the law imputing malice to the author or publisher. See *Curtis* v. *Mussey et al.*, 6 Gray 281 ; *Aldrich* v. *Press Printing Co.*, 9 Minn. 133 ; *Seeley* v. *Blair*, Wright (Ohio) 358, 683 ; *Root* v. *King*, 7 Cow. 613 ; *King* v. *Root*, 4 Wend. 113; *Harwood* v. *Astley*, 1 Bos. & Pul. N. S. 47 ; *Duncombe* v. *Daniel*, 8 C. & P. 222.

In most of these cases the distinction, I have drawn, between cases, where the libelous charges published against public officers elected by the people, or candidates for public office before the people, when they merely refer to the mental or physical condition of the party to fill the office, and cases where the libelous charge imputes crime or moral delinquency, is either not made at all, or but vaguely alluded to ; but an examination of these will show, that in the particular case before the court, which was being commented upon, the libelous charge, which the court held was actionable *per se,* was in every case a charge imputing crime or moral delinquency.

Thus in the case of *Curtis* v. *Mussey et al.*, 6 Gray 373, the court say : "The want of actual interest, to vilify or libel the plaintiff, rendered the publication no less a libel, if such were the natural effect of the words published. There were passages in the publications, which appear on their face to be libelous, such as, the charge of legal jesuitism; the companion to Pilate and Judas; the

charge of prejudice and want of feeling ; the assertion that the decision of the commissioner was a partisan and ignoble act. The statements complained of were not privileged communications, and, as discussions upon a matter of public interest, do not appear to be justified, because they charge the plaintiff with corrupt and improper motives, and because the answer did not aver their truth."

It will be observed, that the court thus selected, as not privileged publications, such portions of the charge, as clearly impute moral delinquency, and tacitly recognize the distinction, I have drawn.

In the case of *Aldrich* v. *Press Printing Co.*, 9 Minn. 138, it does not appear, what the charges published in a newspaper against the plaintiff were ; but we may from the report fairly infer, that they were either direct charges of crimes, or imputed to him moral delinquency. The court say : "Freedom of the press and freedom of speech are equally protected by the Constitution. In this country almost all offices are elective. The press does not possess any immunities, not shared by every individual. In every election the same freedom of discussion of the merits and demerits of candidates is allowed to the press and people. Nor can it be said, that every household visitation, made by itinerant politicians, poisoning the minds of electors with libelous and scandalous charges against candidates, every public harangue, filled with similar matter, every club-room discussion, in which such charges are bandied about with licentious freedom and exaggeration, are privileged communications, and impose upon the injured party the necessity of proving, that they were uttered and published with express malice. We have never supposed, that the freedom of speech, even in this country, could legally be carried to such extent. Yet if such is the law, as to an article published in a public journal, there can be no good reason shown, why it does not extend to all channels of communication between man and man during the pending of an election. We think a public journal, or an indi-

vidual, who indulges in defamatory assertions about candidates for office, is equally liable for his acts with those, who commit the same offense against private individuals."

I think it is obvious, that the defamatory assertions, alluded to in this opinion, are charges of crimes or imputations of moral delinquency.

In *Seeley* v. *Blair*, Wright (Ohio) 358, the charge was of perjury. The court say: "If one accuse another of crime, he is presumed to make a false accusation; and malice is inferred from the falsehood. That the plaintiff was a candidate for office is no excuse for slandering him. We have no right to tell a lie of another, because he is a candidate for office, or is in office; though we may speak the truth of him, we have no right to bear false witness against our neighbor. It would subvert our government, to allow the promulgation of falsehood, which would drive from office men, who regard character, and leave it only to those without any." And in a suit between same parties, Wright (Ohio) 686; the charge was forgery. The court say: "As to the point urged that the plaintiff was a candidate for office, and the defendant an elector, I need only say, the relation of the parties to each other, or to the public. confers upon the defendant no right to utter falsehood and calumny. An elector may freely canvass the character and pretensions of officers and candidates; but he has no right to calumniate one, who is a candidate for office, with impunity. If the law sanctioned such a course, it would drive good men from the administration of public affairs, and throw our government into the hands of the worthless and profligate."

The same judge pronounced this opinion in each of these cases; and it would not be a just inference from his saying, that an "elector may freely canvass the character of a candidate," that he could make allegations imputing moral delinquency on the one hand, or on the other it would not be just from his saying, "that the

plaintiff was a candidate for office is no excuse for slandering him," to infer, that every publication, made in reference to a candidate, though not reflecting on his moral character, would be regarded as libelous, which would be so held, if made with reference to a mere private person.

In the cases of *Root* v. *King*, 7 Cow. 613, and *King* v. *Root*, 4 Wend. 113, the publication in a newspaper was, that Lieutenant-Governor Root, while presiding over the Senate, was disgustingly drunk; and that he was an habitual drunkard. The Chief Justice delivering the opinion of the court says, " that malice is to be implied, and is inferrible, from the libelous character of the publication and its falsity. I fully subscribe to the doctrine of Chief Justice Parsons (4 Mass. R. 169) that when any man shall become a candidate for an elective office, he puts his character in issue in respect to his fitness and qualification for the office; that the publications of truth on that subject are not libelous; and that the publications of falsehood against public officers or candidates deserve punishment. I know of no decision which goes the length of justifying unbounded slander on such occasions."

In the same case, on an appeal to the court of errors, Chancellor Walworth says: " It is supposed by the counsel of the defendants, that an editor of a public paper may publish, what he pleases, of a candidate for public office with impunity, provided he satisfies the jury, he believed it to be true, or that he had no ill will against the person injured. Malice is said to be the gist of the action. But this certainly does not mean malice or ill will towards the individual, in the ordinary sense of the term. If such were the case, an action would not lie against the proprietor of a paper for libel, published in his absence, or without his knowledge, but that such action would lie is settled law. *Andres* v. *Wells*, 7 Johns. 260. In ordinary cases of slander the term, maliciously, means intentionally and wrongfully. Malice is an im-

plication of law from the false and injurious nature of
the charge." And again: "It is however insisted, that this libel was a. privileged communication. If so, the defendants were under no obligation to prove the truth of the charge; and the party libeled had no right to recover, unless he established malice in fact, or showed, that the editors knew the charge to be false. The effect of such a doctrine would be deplorable. Instead of protecting, it would destroy, the freedom of the press, if it were understood, that an editor could publish, what he pleased, against candidates for office, without being answerable for the truth of such publication. No honest man could afford to be an editor; and no man, who had any character to lose, would be a candidate for office under such a construction of the law of libel. The only rule to adopt in such cases is to permit editors to publish, what they please, in relation to the character and qualifications of candidates for office, but holding them responsible for the truth of what they publish."

This language would seem to put allegations, in reference to qualifications not involving character, upon the same footing as allegations imputing moral delinquency. And this may have been the view of Chancellor Walworth; but as the charge in the particular case, he was considering, was a charge, that the candidate was an habitual drunkard, which involves moral delinquency, it would not perhaps be right to give to the Chancellor's language a larger meaning than, that an editor should be held responsible for the truth of such allegations.

In the case of *Harwood* v. *Astley*, 4. Bos. & Pul. 47, the words, which were the basis of a suit, were uttered against a candidate for Parliament, and were: " Sir Jacob Astley is a scoundrel, a coward, a liar, an assassin and a murderer." Sir James Mansfield, Chief Justice, says: " It seems to be supposed, that the situation of a candidate for Parliament is such, as to make it lawful for any man to say anything of him. To that proposition I cannot assent. It would be a strange doctrine indeed,

that when a man stands for the most honorable position in the country, any person may accuse him of any imaginable crime with impunity. The particular situation of the plaintiff cannot prevent the words from being actionable."

No inference can be drawn, that the court in this case would have held, that words asserting the mental or physical disqualifications of a candidate, though published and false, would have sustained an action.

In the case of *Duncomb* v. *Daniel*, 8 C. & P. 222, (34 Eng. C. L. R. 61) the basis of the action of libel was a letter published in a newspaper, charging a candidate for Parliament with cheating in two transactions named. Lord Denman, Chief Justice, said : "It appears to me, the occasion did not justify the present publication. However large the privilege of electors may be, it is extravagant to suppose, that it can justify the publication to all the world of facts injurious to a person, who happens to stand in the situation of a candidate." It seems to me but fair to interpret this language, in view of the facts of the case, as meaning "injurious to the moral character of a candidate."

These decisions are not, I think, when considering the facts of the cases, in which they were delivered, inconsistent with the proposition, I have stated, that a candidate for the suffrages of the people cannot complain, that his talents and qualifications mentally and physically for the office, he seeks, are commented on in the newspapers, even though these comments be ever so malicious and unjust. When he becomes such a candidate, all his pretensions become the proper subject of enquiry and discussion, so far as his fitness for the office, either mentally or physically, is concerned. The public interest requires, that this discussion should be untrammelled; and that no one should be held liable for anything, he may publish concerning the fitness of such candidate, mentally or physically, for the office he seeks. For if his liability for publications in reference to such

candidate's fitness in these respects depended on the judgment of a jury, whether the publications were either true or free from malice, the public interest must suffer; as the apprehension, caused by such a liability, would prevent that free discussion of the fitness of candidates for popular suffrage, which is absolutely essential to the successful operation of a republican government. And the public interest further requires, that the conduct and acts of such a candidate be freely criticised in the newspapers, and that there shall be no liability incurred for such criticism, though it be ever so unjust, provided it be *bona fide*, and provided the facts constituting such acts or conduct criticised are proven to be true. But public policy forbids, that the moral character of such a candidate should be falsely assailed in the newspapers, or that he should be falsely charged by publications in newspapers with crimes. If the newspaper press was allowed to be licentious, the result would be, to drive from the control of newspapers all men of character, and to deter from seeking office all but the profligate and abandoned. Nor would the result be different, if a belief in the facts, on which such false and libelous allegations were based, was held to be a legal excuse for publications of this character against such candidates. To justify such a publication, it must be proven that the allegation is true in fact.

Applying this law to the case under consideration, as the declaration itself shows on its face, that when the alleged libels were published, the plaintiff was a candidate for popular suffrage in Ohio county, any allegations, which referred to his fitness for the office, he sought, mentally or physically, were privileged publications, and could not be the basis of a libel suit; nor any other allegations, which did not refer to his moral character, though they were ever so harsh and uncomplimentary.

The declaration contains several allegations of this character, which are complained of as libelous, such as "the laboring men are taught to believe, that a certain

candidate (meaning the plaintiff), who never did an honest day's work, is their especial champion and friend," "a confessed ignoramus, he argues that intelligence should control the election (meaning thereby, that the plaintiff was publicly and confessedly known to be a man of great ignorance") and "the laboring men of Wheeling are asked to vote for a man, who never earned an honest penny, or did a stroke of labor in his life. Honest industry loathes such association. Vote for Pannell."

These statements, published about a candidate for popular suffrage, are not libelous. They amount only to allegations, that he is an uneducated, lazy and ignorant man ; and as such he is unfit to represent the people. Such allegations may be made about a candidate for such position, and are not rendered libelous by being expressed in coarse and harsh language. Such language may show ill will on the part of the publisher ; but such a publication, being absolutely privileged, its being inserted in a newspaper maliciously does not render it a legal basis for a libel suit.

There are also other allegations in the declaration, which are not *per se* libelous, when published with reference to a candidate for such position; but which, explained by a proper inducement and accompanied by a suitable innuendo, would be libelous, such as these : "No man in the community has any interest in seeing the county disgraced by sending a social leper to speak and act for her in public councils," and "it is as much the duty of a citizen to vote against Jimsweeney to-day, as it would be to deodorize against the cholera." This language charges, that the candidate is utterly unfit to be received into decent or polite society. If this unfitness was alleged to arise from his total want of education, his rude unpolished or vulgar manners, his disgusting and filthy mode of dressing, such allegations, published against a candidate for such a position, would be absolutely privileged. They would be no assault on his moral character. His ignorance, stupidity, rudeness of manners

1878
Special Term.

Sweeney
v.
Baker *et al.*

or filthy habits of dress might be freely commented on; and whether allegations of this character were true or false, uttered maliciously or in good faith, they could not be the basis of a libel suit. On the other hand, the meaning to be attached to the words, he is a "social leper," and the obnoxious word "deodorize," as used above, may be, that his moral traits of character are such, as require his banishment from society. If there was an inducement and innuendo, which fairly interpreted would give this meaning to these phrases, then they would be libelous; but unexplained, they are not, I think, libelous, when published against a candidate for such position.

But there are in the declaration charges of the publication by the defendants of a large number of allegations, which, though published against a candidate for such position, are unquestionably libelous, and not entitled to be considered privileged publications, absolute or conditional. They are violent assaults on his moral character, which, if untrue, which the law presumes them to be, unless the contrary is shown, are gross outrages, the publication of which would not be justified, though the publisher believed them to be true, and had probable cause for so believing. Such publications can only be justified by proof of their truth.

Such is the character of the following statements, published by the defendants: "A professional gambler he preaches morality;" "let the people of Ohio county not select a representative from the prize ring or gambling den;" "the noble game of draw poker is a candidate for popular suffrage to day. It runs on the same ticket with the manly art of fist and skull;" "as a political argument the fist of a bully and the kit of a gambler are not entirely satisfactory;" "bullies and blacklegs are supposed to be an inevitable evil, the buzzards and body-snatchers of society;" "when the bully and the blackleg presents his personal and professional issue for approval at the polls, it is safe to be pre-

sumed, the intelligence and respectability of the community will decide it to his satisfaction;" "would you select a man to make laws, whom you would kick out of your house, and whom you wouldn't trust in your hen coop?" "we are not disposed to believe, that Ohio county people are going to vote to-day for rowdyism and the pimpery of the faro bank;" "if Jimsweeney can be sent to Charleston, he might be induced to take a faro kit with him, and enliven the tedium of legislation with the ennobling diversion, which has brought such bright laurels to his brow;" and "not now, for the first time, do we summon the people of this county to cast their ballots against the boozing-ken, the sweat-cloth and the bagnio."

These publications amount to charging, that the plaintiff was a professional gambler, a bully, a thief and a whoremaster. If this were true, these publications were entirely justifiable. Any citizen would have a perfect right, by such publications, to warn the people against electing to the legislature a man of such imfamous character. If the truth was not a complete justification of such a publication against a candidate for popular suffrage, our legislative halls might, and probably would, be filled with scoundrels of the lowest kind. The preservation of a republican government requires, that when a man of such character offers himself as a candidate for popular suffrage, any citizen, through the newspaper press, may expose the infamous character of the candidate, and thus avoid the imposition on the people of such men to office.

On the other hand a person, who publishes in a newspaper falsely, that a candidate for such an office is a professional gambler, a bully, a thief and a whoremaster, ought to be severely punished. The fact, that the party is a candidate for an office to be bestowed by the votes of the people, so far from its being a justification for such falsehoods, makes the outrage greater. If published against a private person, not seeking such an office, it is

admittedly a great outrage, for which the law affords redress not only by civil action by the party injured, but also by indictment. But if such falsehoods are published against a candidate for popular suffrage, the outrage committed is still greater. If it were allowed by law to be done with impunity, it would be utterly destructive of a republican government. Who would be a candidate for office in such a government, if falsehoods of this infamous character could be published against him? None would be such candidates but abandoned men, who had no respect for their characters. And how intolerable would the government become, whose offices were filled by men of such character. The law, as well as the juries, must suppress such licentiousness of the press.

It is proper to say, that what I have said with reference to the right to publish certain remarks in a newspaper relative to a candidate for an office, within the gift of the people, should be understood as confined to candidates for office to be elected by the people, and cannot be extended to candidates for an office, the appointment to which is made by a board of limited members, such as a city council. The right, to make unjust and false commentaries on the qualifications of a candidate for an office of this description, is much more limited. See *Kren* v. *Bennett*, 19 N. Y. 174.

It should also be remarked, that all, that I have said, has application only to the common law duties and rights of parties, and that it has no reference to the right of a party to bring a suit for any language or words, which from their usual construction and common acceptation, are construed as insults, and tend to violence and breach of the peace, as provided for by the second section of chapter 103 of the Code of West Virginia, page 545. A suit may be brought under this statute for any words, the plaintiff regards as insulting; and the jury alone are to say whether they are insulting, &c. No demurrer lying to the declaration, because the words are

not regarded by the courts as insulting. But such words on a proper plea, showing that they were uttered on certain occasions, may be held privileged.

Some of the matters, alleged in the printed counts of the declaration, which are common law counts, and which are complained of as libelous, are, as we have seen, absolutely privileged communications under the facts, stated in the declaration, and therefore not libelous.

The appellants' counsel therefore insist, that the circuit court ought to have sustained the demurrer to these counts. They insist, that the fifteen different allegations, complained of as libelous, in three counts, really constituted fifteen different counts in the declaration; and that the circuit court erred in not sustaining a demurrer to such of them as were not libelous. To sustain this position, they rely on the case of *Cheatham* v. *Tillotson*, 5 Johns. 430, and on the opinion of Senator Clinton, who expressed the views of a majority of the court in that case.

The declaration in that case was drawn in the form of a declaration having but one count. After setting forth several matters as libelous, the declaration proceeds to state, " that in another part of the said newspaper, among other things, the libelous matter following of and concerning the plaintiff," and then proceeded to set forth other language, which the court held was not libelous. The declaration is given in 2 Johns R. 64, and is not, I think, correctly stated in all respects by Senator Clinton.

After his not very accurate statement of the character of the declaration he proceeds: "A person may be libeled more than once in the same publication. In declaring on a libel, so much of the libelous matter, as the plaintiff chooses to select, may be counted on. If the declaration states the whole libel, then there is necessarily but one count; but if after selecting and setting it forth as libelous, he then proceeds to select another part, as distinctly libelous, it appears from his own showing,

that he alleges himself to be twice libeled, and claims damages in proportion to the enormity of the charges;" and again: "the plaintiff clearly assigned two different gravamens, two substantive causes of complaint, two distinct libelous charges, and consequently two counts in substance and essence, though not in all respects artificially correct and conformable to the technical rules of pleading. It is no answer to this to say, that the second allegation of libelous matter ought to be considered as surplusage, and that as such it may be rejected, and will not vitiate the pleading. How a charge, which according to the innuendoes imputes to the plaintiff below bribery and corruption, can be considered as surplusage, I am at a loss to conceive. If the innuendoes be legitimately drawn" (which they were not) "the second matter, referred to as libelous, far exceeds in turpitude the first imputation; and much less can any matter be considered surplusage, which, according to the exposition, is a substantive, distinct, disconnected cause of action. The first count appears to me correctly stated; and the matter, it sets forth, is undoubtedly libelous. The second count is essentially defective and erroneous; and inasmuch as the plaintiff below has taken judgment generally, I am for reversal." And with Senator Clinton a majority of the court concurred; but from these views all the judges, who constituted a part of the court, dissented; as appears from the statement of Savage, Chief Justice, in *Rathburn* v. *Emigh*, 6 Wend. 411, who also states, that the point, above made by Senator Clinton, was not even made, when the case was before the Supreme Court.

The dissenting views of the judges were set forth by an opinion delivered by the chancellor; he says: "The plaintiff in error insists, that the declaration contains two counts: the declaration, after the usual averments, that the defendant in error sustained a fair reputation; that he held the office of secretary; that the plaintiff in error, with intent to injure him, published a libel *in one part* acccording to the tenor and effect following

(setting forth some part of the libel) and *in another part* according to the tenor and effect following (setting forth other parts of the libel) concludes, by means of composing, writing, and publishing of which said false, scandalous libel, and libelous matter, hereinbefore set forth, the plaintiff (the defendant here) has been greatly injured," &c.

If this declaration had detailed the whole libel, *verbatim*, in one connected description, no legal subtilty could possibly have severed the different parts: and yet the only difference is, that, in the former case, the whole would be spread on the record, as contained in one entire paper. In the present case the libel is alleged to contain, among other things, two distinct paragraphs, set forth in the declaration, which are complained of collectively, and not each separately, as to cause of injury. If there is only one count, and if a mere perusal of the declaration does not carry conviction to the mind, that the libel is not only a virulent one, but that it has a direct and unequivocal application to the defendant in error, I shall refrain, by any reasoning on the subject to endeavor to effect it. To me both appear clear and undoubted."

An examination of the declaration as stated in 2 Johns. 64, satisfies me, that the chancellor correctly epitomized this declaration, and that an incorrect view of it was taken by Senator Clinton. The case as reported in 2 Johns. 63, and in 5 Johns. 430, and especially what is said about it in the chancellor's opinion would seem to indicate, that there was much hardship in the case against the defendant, which probably influenced the majority of the Senate to be for its reversal, and it was this, which gave rise to the ingenious, but I think sophistical, views of Senator Clinton, which, it seems, had never occurred to the counsel in the cause, until it reached the Senate.

In the case before us each of the first two counts clearly shows on its face, that but one libel is intended to be complained of in each count, and that different

portions of this one libel are quoted by the plaintiff, and this being clearly the case, even according to Senator Clinton's views they would, taken together, constitute but one count. The case before us differs from the New York case in this, that it may from the declaration in that case be inferred, that the libelous matter was contained in two separate articles published in one issue of the newspaper; but in the case before us no inference can be drawn from the declaration, that the various libelous matters, set forth in the first count, were not all in one and the same article published in the newspaper; and so of the various libelous matters contained in the second count. But if the contrary appeared, it would not make each of the libelous allegations, contained in the first and second counts, a distinct count. We must judge of what constitutes a count, by the frame of the declaration, if it contains matter only published at one time, and not by whether it appeared to have been published in one or more articles in the same newspaper. And all the libelous statements respecting the plaintiff, contained in one issue of a newspaper, may properly be joined in one count.

In the case of *Alfred* v. *Farlow*, 8 Ad. & E. N. S. 852 (55 English C. L.) it was decided, that different words used in one discourse, though stated separately, may properly be included in one count in a declaration ; and if the declaration so includes them, they will not be construed, as constituting two counts.

In the case of *Wakley* v. *Healy*, 7 M. G. & S. 591, (62 English C. L.) the first count in the declaration was very similar to the declaration in the case before us, alleging, that the defendant published on a certain day a libel, one part of which contained certain libelous language, quoting it, and then proceeding: " and another part of which libel contained the false, scandalous, malicious and defamatory matter following, quoting it. And it was held, that this constituted but one count; and these two allegations could properly be included in one count.

1878
Special Term.

Sweeney
v.
Baker *et al.*

In the case of *Hughes* v. *Rees*, 4 M. & W. 206, Lord Abinger said: "You may put into one count for libel and slander all words, spoken or written at one time; but I am not aware that you may put into one count matters published at different times;" and it was accordingly held, that there was more than one count in the declaration in that case, it appearing on the face of the declaration, that the matters complained of were published at different times.

There can be no doubt therefore, that the matters stated, in what is called the first count of the case before us, constituted but a single count, being published at one time ; and so the matters contained, in what is called the second count, being published at one time, properly constituted but one count. The first count contained the allegation, that the defendant published about the plaintiff this language: "A professional gambler he preaches morality," with the innuendo, meaning thereby he, the plaintiff, was a professional gambler. This was, as we have before shown, clearly libelous, and it is not vitiated by the allegations in other parts of this count of other matters, published at the same time, and complained of as libelous, because as we have seen, these other matters were not libelous; and such allegations in the declaration must be regarded as mere surplusage.

The second count contains numerous allegations, clearly libelous, and some, published at the same time, which are not libelous, and which must be regarded as mere surplusage. The third count being framed under our statute making insulting language libelous, is by the statute not liable to demurrer on the ground that the language used is not insulting; the jury and not the court is to judge on this question.

Syllabus 3.

It is said however, that each of these counts is demurable, because it is double, bringing into one count different charges, which ought to have been inserted in different counts. If this were so, it could not now be objected on demurrer. Duplicity in a declaration was

at common law only ground for special demurrer. As a plaintiff had a right in one declaration to insert as many distinct charges of the same character in different counts, it is obvious, that the inserting these in one count would be a mere error of form, unless it could be shown, that the defendants could thereby suffer substantial injury.

This might be the case in England, in New York or in other States, where the rule is, that if there are several counts, and a verdict is entered generally on all the counts, and entire damages are given, if one count is bad, the judgment will be arrested and a *venire de novo* awarded. See *Hopkins* v. *Bendel*, 1 Caines 347, *Hughes* v. *Rees*, 4 M. & W. 206. But this is not the law in Virginia or West Virginia. Our statute law expressly providing: "when there are several counts, one of which is faulty, if entire damages are given, the verdict shall be good." R. C. of 1819, vol. 1, ch. 76, §27 p. 112; Code of W. Va. ch. 131 §13 p. 627. Here at least duplicity in a declaration is an error of form only; and it has been expressly decided in this State, a demurrer to a count in a declaration, because of duplicity, ought not to be sustained; as special demurrers except to pleas in abatement are abolished by §29 ch. 125 of Code of W. Va. See *Mattie Coyle* v. *The B. & O. R. R. Co.*, 11 West Va. 64. See also *Rennuird* v. *Jones*, 9. Gratt. 184; *King* v. *Howard*, 1 Cush. 141; *Smith's adm'r* v. *Lloyd*, 20 Gratt. 313.

The inconvenience of the practice of so holding, urged by appellants' counsel, is more imaginary than real. If in one count a debt was claimed and damages for the conversion of property, the count would be bad, not however for duplicity, but for misjoinder of action. The declaration would be equally bad, if such claims were made in two different counts. Again the supposed difficulty, thrown in the way of the defense by permitting a count to be double, is also imaginary; as the defendant may plead separately to either or both parts of the count. Again, the record fails in this case to show Syllabus 2

1878
Special Term.

Sweeney
v.
Baker *et al.*

Syllabus 11

the filing of any demurrer. It is true, the clerk copies at the end of the record a certificate of Judge Melvin, that a demurrer had been filed and overruled, and that no entry of it had been made by the clerk. This certificate bears no date ; but it is probable, it was made after the term of the court, in which final judgment was entered, as the certificate states, that it was made, at the instance of the defendants against the protest of the plaintiff, to have such effect, as the Court of Appeals may deem it entitled to. But assuming that this certificate was made and signed by the judge, while the cause was pending in his court, and while he would have had, at least under some circumstances, a right to have had the record corrected by the clerk's entering on the record book the filing of the demurrer, and the overruling of it by the court, still it would be impossible to regard this memorandum, as the equivalent of such an amendment. The record book itself must show, what pleadings have been filed, and what has been the action of the court upon them ; and if the clerk omits to enter the filing of a pleading, or the action of the court on it, the court has, under some circumstances at least, the power, pending the suit, to have such entry made on the order book *nunc pro tunc.* But the record has not been so corrected in this case. The record book still fails to show the filing of a demurrer at any time ; and to this record book alone can we look to ascertain, whether a demurrer was filed. The memorandum of the judge is in no manner referred to on the record book, and cannot be considered as a part of the record in the case, though the clerk does certify, that it is a transcript of a paper in the cause. See *White* v. *Toncray,* 9 Leigh 347 ; *Morrissett's case,* 6 Gratt. 673 ; *Canningham* v. *Mitchell,* 4 Rand. 189 ; *Bowyer* v. *Chestnut,* Leigh 44 ; *Snydam* v. *Williamson,* 20 How. (U. S.) 439 ; *Young* v. *The State,* 23 Ohio St. 578 ; *Reed* v. *Gardner,* 17 Wall. 409.

The next enquiry is, as to whether the defenses made, or offered to be made, in this case were proper to be al

lowed in the manner, in which they were proposed. To comprehend these questions, it is proper to consider the law generally in reference to libel suits; and then apply this law to the present case. Much controversy of a very bitter character existed for centuries, whether the truth of the written paper, on which an indictment for libel was based, could be given in evidence. In the celebrated case of *The People* v. *Croswell,* 3 Johns. Ca. 338, the whole subject is discussed at great length, and the court was equally divided on this question.

. In a civil suit for libel at common law, though at one time doubted, it has been well established, that the truth of the matter published is a complete defense. The publication of the truth so far as liability to a civil suit is concerned, is at common law absolutely privileged. But, while this is admitted to have been the common law, the justice and expediency of this rule was not generally, much less universally, conceded. Thus Lord Brougham in his evidence report to the House of Lords on libel &c. July, 1843, says : "I am quite clear, that the truth ought not to be made decisive (or a defense) either in civil or criminal proceedings ; for cases may be put, when the truth, instead of being a justification, would not even be any mitigation, nay when it would be an aggravation

As an example of a case of this description we may put the maliciously ridiculing, by publication in a newspaper, a man, without any justifiable end, by exposing his physical or mental defects, and bringing him into public ridicule and contempt. At common law no civil suit would lie for such a libel, if what was stated in the publication could be proven to be true. On the other hand it is obvious, that in a great majority of cases, when the publication truthfully assailed a party's moral character, the truth of the publication ought to be a complete bar to any civil suit.

Where the action or count is based upon our statute, allowing an action to be brought for insulting words, spoken or written, the Virginia courts, prior to the pas-

*Margin notes:* 1878 Special Term. Sweeney v. Baker et al. Syllabus 4

sage of the Code of Virginia of 1849, were divided in opinion, whether, under the plea of not guilty, the truth of the words spoken or written might not be given in evidence under the general issue in mitigation of damages ; but the court held, that the truth of the allegations could not, in a suit for insulting words under the statute, be pleaded in bar of the action.   *Moseley* v. *Moss*, 6 Gratt. 534 ; *Brooks* v. *Calloway*, 12 Leigh 466· The majority of the court  held, that the truth of the allegation in a suit for insulting words, based on the statute, might be given in evidence under the general issue in mitigation of damages, because the truth of such allegation, under the statute, could not be pleaded in bar ; and as it was proper, it should be in some way permitted to be brought before a jury, it ought therefore to be allowed to be proved under the general issue, though it could not be so proved upon a suit at common law for libel.   But in the Code of 1849, a provision was inserted, that "in any action for defamation the defendant may justify by alleging and proving, that the words spoken or written were true."  Code of Virginia, ch. 176, §44, which statute is still in force in this State, except so far as it has been modified by our Constitution.   See Code of W. Va. ch. 130 §47, p. 625.

The Court of Appeals of Virginia, *Hogue* v. *Wilmoth*, 16 Gratt. 80, construed this statute, as changing the law theretofore existing in Virginia, and as permitting to be filed, as a plea in bar of an action for insulting words spoken or written, their truth, thus putting on the same footing in this respect a common law and a statutory action for libel.   But the court in that case saw the gross injustice, which would be done the plaintiff by such a· state of the law, and intimated, that, while this was the law generally, the court might in some way, not defined, restrain the defendant in such a defense, where instead of its being a bar, or even a mitigation of the offense, it was an aggravation, as in the case of " allusions to personal defects, family misfortunes, and the like."

1878
Special Term.
Sweeney
v.
Baker et al.

This being the state of our law, the first Constitution of this State provided, that " In prosecutions and civil suits for libel the truth may be given in evidence ; and if it should appear to the jury, that the matter, charged as libelous, is true, and was published with good motives and justifiable ends, the verdict shall be for the defendant;" and this provision is contained in our present Constitution. See Art. 3 sec. 8, Con. of 1872. Its purpose is apparently to settle the bitter controversy, which had existed on the question, whether in a criminal prosecution for libel the truth of the libelous allegations was a bar to the proceedings ; and to have it determined, that it should not be so always, but only when the libelous allegations were published with good motives and for justifiable ends ; and to put upon exactly the same footing both common law suits for libel and statutory suits for libel in the publication of insulting words.

The truth is a bar to either of these actions, provided Syllabus 4 the publication was made with a good motive and justifiable ends, and not otherwise. At common law, in actions of libel under a plea of not guilty the defendant could not of course have given in evidence the truth of the libelous allegations, as bar to the action; nor was he, according to the best authorities, under the plea of not guilty permitted to prove the truth of the allegation in mitigation of damages ; for if allowed so to do, the plaintiff would be taken by surprise. If the defendant intended to rely on the truth of the allegations as a defense, he was required to plead such justification specially in bar of the action. And such, I apprehend, was the law, when this constitutional provision was adopted, in reference to statutory suits for words spoken or written, which were insulting. For though before 1850 it was1 as we have seen, questioned, whether under the genera issue the truth might not be given in evidence in mitigation of damages, but the ground for supposing it might be, was, that before that time it could not be pleaded in justification ; but as this was changed by the Code of

1849, it would seem, that after that it would have been held, that the statutory and common law action would in these respects stand on the same footing.

Judge Baldwin in the case of *Moseley* v. *Moss*, 6 Gratt. 542, assigns one of the reasons why under the plea of not guilty the truth of the words spoken or written could not be given in mitigation of damages. It is: if the facts tending to prove the truth of the charge were admitted under the general issue in mitigation of damages, it would be impossible to draw the line, and stop short of actual conviction. Facts tending tó prove the plaintiff's guilt are of course proper under the plea of justification; and if the defendant has also put in the general issue, there is no reason, why, when before the jury, they may not be considered by them in mitigation of damages; and it has been so held in *Chalmers* v. *Shankell*, 6 Car. & P. 475; *Welmet* v. *Harmer*, 8 Car. & P. 695; *Thomas* v. *Dunaway*, 30 Ill. '373; *Sloan* v. *Petrie*, 15 Ill. 425; *Raymer* v. *Kinney*, 14 Ohio St. N. S. 283; *McAllester* v. *Sibley*, 25 Me. 474; *Moorehead* v. *Jones*, 2 B. Mon. 212.

There are some authorities in conflict with these; but the rule, above laid down, seems to me to be sustained by the weight of authority and by reason. These and other authorities lay down the rule, which seems to me correct, that if a plea of justification is filed, and is entirely or very slightly sustained by evidence, the filing of such a plea is an aggravation of the damages, the jury should find under the plea of not guilty; but if the evidence is strong to sustain the plea of justification, though it fails to establish fully this defense, yet it would certainly tend to show a less degree of malice on the part of the plaintiff in uttering the words or publishing the libel, and should therefore be regarded as a mitigation of the damages. But this has been denied; and it has been held, that such a plea should always be regarded as an aggravation, or that it should have no effect either in mitigating or aggravating the damages in

any case. See *Shoulty* v. *Miller*, 1 Carter (Md.). 544 But these decisions are not, we think, in accord with the weight of authorities or reason.

Another and still stronger reason, why the truth of the allegations ought not to be given in evidence under the general issue, is, that this truth can be only established by proving specific facts to establish a general allegation libelous in its character; and if they could be proven under the general plea of not guilty, the plaintiff would be surprised at the trial, not knowing, what particular facts the defendant would offer to prove; if the plea of justification is put in, the law did not permit the defendant to allege generally, that a general libelous allegation as laid in the declaration was true, but required him to set forth the particular facts, which justified the general libelous allegation, so as to afford the defendant a fair opportunity to contradict the plea by evidence at the trial, and also that the court may see, whether the defendant was justified, in what he published. *Torrey* v. *Field*, 10 Vt. 353; *Wachter* v. *Quenzer*, 29 N. Y. 547; *Fry* v. *Bennet*, 5 Sandf. 54.

This being the established law, when our Constitution was adopted, it seems obvious from the very wording of the 8th section of article 3, of the Constitution, of 1872, that it was not intended to change the rule, that the truth of the libelous allegation could not be given in evidence under the general issue. Its language is: " In prosecutions and civil suits for libel the truth may be given in evidence; and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the verdict should be for the defendant." As the verdict is to be, if the truth and proper motives and ends are proven, for the defendants, it is obvious, that the evidence was to remain, as it had been, receivable under the plea of justification only; for, if it were receivable under the plea of not guilty, it is obvious, that it would only be in mitigation of damages; and therefore the verdict would have to be for the plaintiff.

Syllabus 4 III

Syllabus 1 I

1878
Special Term.

Sweeney
v.
Baker *et al.*

Syllabus 4 II

It seems to me equally obvious, that the constitutional provision, was not intended to change the rule, that, if the charge is general, the defendant could not in his plea of justification allege generally, that the charge was true, but must specify the particular facts, which show the general charge to be true. The constitutional provision does not on its face purport to affect or change the rules of pleading, but only permits certain evidence to be given, as I understand it, under proper pleas, framed according to established rules. The object of the constitutional provision was, in all actions of libel, common law or statutory, or prosecutions for libel, to permit the truth to be given in evidence, ·if proper pleas were filed, and provided the publication was made with proper motives and justifiable ends. The question, when the truth could be given in evidence, had been a subject of controversy, and when it had been admitted as a defense, it had been admitted without reference, to whether it had been published with good motives or for justifiable ends ; and hence the necessity for such constitutional provision, for the law prior thereto was unsettled to a considerable extent, and on points, on which it was settled, it was generally admitted, that it was unjustly settled, as it was proper to permit, the motives of the defendants in publishing the libel to be considered by the jury, even though the publication was true. But the rules of pleading, which we have stated, were in themselves just and gave general satisfaction ; and there was no necessity for a change in them ; and the constitutional provision on its face does not purport to change them. They can not therefore be regarded as changed, except so far as the change in the law necessitates a change of them according to the general rules of pleading.

In the case of *Wachter* v. *Quenzer*, 29 N. Y. 552, 553, it appears, that by the Code of New York it is provided, "that the defendant may allege both the truth of the matter charged, and any mitigating circumstances." Yet it was held, that the truth of the matter charged, if the libelous

matter was a general charge, could not under this statute be alleged generally, but only in the common law mode, by alleging the particular facts, which showed the truth of the general charge, so as to afford the defendant an opportunity of controverting the plea by evidence at the trial.

To apply the law, as above stated, to the present case, it is obvious, that the court did not err in the rejection of the first, second and third special pleas first offered. They simply alleged, that the matters charged in the several counts as libelous were true, and were published by the defendants with good motives, and for justifiable ends. These pleas violated a well established rule of pleading, in being too general; and this rule of pleading has not been changed by the constitutional provision before referred to.

Nor did the court err, in rejecting the fourth special plea, subsequently offered. This plea was a justification of the allegation in the first count of the declaration, that the plaintiff was "a confessed ignoramus." The declaration showed, that the plaintiff was a candidate for office in the gift of the people; and the defendants, newspaper editors. And we have seen that for such a publication, under these circumstances, no action could be brought, whether it were true or false. It was therefore mere surplusage; and a plea tendering an issue, whether it were true or false, tendered an immaterial issue. The plea should therefore have been rejected for this reason alone, even had it been otherwise unobjectionable. Had the charge, that the plaintiff was a "confessed ignoramus," been made in the third count, which was filed under the statute, making insulting words actionable, they could not have been treated as surplusage, and a proper plea of justification, setting out that the plaintiff was a candidate for popular suffrage, and the defendants were newspaper editors, and therefore justified in the publication, ought to have been received; because, as insulting words, the publication, that he was

an ignoramus, would have been actionable, as no demurrer could be filed to raise a question, whether the words used were insulting. But, as I understand our statute, as it is now worded, any plea of justification, which was good to a common law action of libel, is good in this statutory action, whether it be the truth of the publication, and that it was made with good motives and justifiable ends, or whether it be facts, that show the occasion, on which it was published, was absolutely or conditionally privileged. But the first count not being based on the statute, it was bound to set out such a charge as constitutes a defamation at common law. · See *Hogue* v. *Wilmoth,* 16 Gratt. 80. In this count therefore the charge, he is " a confessed ignoramus," being, under the facts stated in the declaration, not actionable, it was surplusage.

The views, above expressed with reference to defenses to the statutory action being now admissible, whenever they would be admissible in a common law action of libel, seems to be deducible from the change in the wording of the statute, made in the Code of 1850, which left out the words in the former law, "that no *plea* or exception should preclude the jury from passing on the words," and from the case of *Hogue* v. *Wilmoth,* 16 Gratt. 86.

It may be here observed, that Judge Baldwin in *Moseley* v. *Moss,* 6 Gratt. 545, said : " Whether a party, aggrieved by a common law defamation, may waive proceedings upon it as such, and elect to treat it, as an insult under the statute, is a question of much interest, which I will not consider ; " and again : " If the defamation be written, a further question may arise, whether the statute, applies to insults in writing."

Syllabus 5

The third count, in the declaration in the case before us, fairly raises both these questions, suggested by Judge Baldwin; and, it seems to me clear, they must both be answered in the affirmative. The statute in its language is broad enough to cover words, actionable at common

law, and written words of defamation. All insulting words, which tend to violence and a breach of the peace, are made actionable. They do not cease to be insulting words, because they charge the party with a crime ; nor do they cease to be insulting, because the words are written and published. On the contrary, these added qualities render them more insulting, and make them tend more to a breach of the peace. They come within both the spirit and words of the statute. The appellants' counsel, in their able and exhaustive argument, do not rely on these points, suggested by Judge Baldwin ; and I infer, that they properly regarded it as clear, that both of Judge Baldwin's questions must be answered affirmatively ; and that the third count was not for these reasons defective.

The special pleas, which were received, are not liable to the objection, that caused the rejection of the three special pleas first offered : that the truth of the libelous charges were pleaded in too general a manner. Nor was it any fault in these pleas to fail to assert, that the libelous charges justified were published with good motives and justifiable ends. The declaration on its face showed, that if these libelous charges were true, they must have been published with, what the law conclusively presumes were good motives and for justifiable ends. If this had not appeared on the face of the declaration, the pleas would have been defective, if they failed to show this. Nor would it, for the reasons already stated, have been sufficient, in such a case, to have pleaded generally, after setting out the facts specially, which showed the truth of the allegations, to have said in general terms, that they were published with good motives and for justifiable ends. They ought, in such case to be good, to have set out the fact, that the plaintiff was a candidate for popular suffrage, or such other facts, as showed their motive in the publication to be good, and their ends justifiable. It seems to me, however, that the rule of pleading, which requires the party pleading to confess the previous matter,

and avoid it, or traverse it, was not properly observed. See Starkie on Slander and Libel, side page 383, §482 ; but of course the appellants cannot object to their own pleas, which were received by the court.

The appellee insists, that, as no bill of exceptions was filed to the four pleas, which were rejected by the court, none of the pleas can be looked at by this court, as they constitute no part of the record, and they could only be made a part of the record by a formal bill of exceptions, to sustain which position they refer to *White* v. *Toncray,* 9 Leigh 347 ; *Morrissett's case,* 6 Gratt. 673 ; and in addition thereto we may refer to the case of *Herrington* v. *Harkins's adm'r,* 1 Rob. 591.

These cases all differ from the case before us in this, that in all of them the record did not show, that the rejection of the pleas were excepted to by the defendants. In each of them not only was no bill of exceptions filed, but no entry was made on the order book, that the defendants objected, or excepted to the action of the court in rejecting their pleas. But in the case before us the order book expressly states, when these pleas were rejected, the defendants' exception to the ruling of the court in rejecting them.

The syllabus in *White* v. *Toncray,* 9 Leigh 347, correctly states the point decided in that case thus : " Pleas tendered by a defendant in an action at law, and rejected by the court, are not a part of the record, unless made so by bill of exceptions to the rejection of them, or by order of the court, that they shall be made so." And this decision has been very properly approved by the subsequent decisions both in Virginia and West Virginia. See *Hart* v. *The Baltimore and Ohio Railroad Company,* 6 W. Va. 336.

It is true Judge Tucker in his opinion in the case of *White* v. *Toncray,* 9 Leigh 347, would seem to think, that a formal bill of exceptions was necessary, if the defendant wanted the rejection of his plea reviewed. His reasons are, first, that the rejected plea may be identified, and second, that in the formal bill of

exceptions the court might have an opportunity for assigning its reasons for the rejection of the plea.

There seems to me but little force in either of these reasons. The clerk by his certificate has to identify the pleas, actually filed; and Judge Tucker admits, that if the court on its order book directs the rejected plea to be made a part of the record, it thereby becomes a part of the record, and it must then of course be identified by the certificate of the clerk, unless it is contended, that the court can only make an order, directing a rejected plea to be made a part of the record by copying the plea on the record book, which I can hardly imagine any one could suppose to be necessary. There especially seems no objection to the court entering an order, directing a rejected plea to be made a part of the record, leaving the plea to be identified by the clerk's certificate, as other pleas are, when we consider, that practically, even when a bill of exceptions is formally taken, the rejected plea is still only identified by the clerk's certificate, as it is not usually incorporated in the bill of exceptions, but only referred to by its number, leaving the clerk to identify the plea, intended to be referred to.

The second reason seems to me still more unsatisfactory, if considered as a reason for requiring a bill of exceptions to be filed in every case. It may be a very good reason for requiring a bill of exceptions in certain cases. If, for instance (assuming that the court has a discretion in permitting a plea in bar to be filed at any time, before the jury is sworn, which may perhaps be questioned) a plea was tendered at a time, that in the opinion of the court it would be unjust to the plaintiff to permit it to be filed, because the case had been called for trial for instance, the court might then very properly refuse to permit an order to be made, that the rejected plea be made a part of the record, and the rejection of it entered on the order book as excepted to by the defendant, and direct, that it should be only made a part of the record by the filing of a formal bill of exceptions,

in which the facts not of record, on which the court might base its action, and the objection to the rejection of the plea might be set forth at large. But ordinarily the record itself shows all the facts, necessary to determine, whether a plea is properly rejected, when the rejected plea is ordered to be made a part of the record, as usually the only reason for rejecting it is, that the plea is bad on its face, or, if it be a plea in abatement, that it is offered too late, the time when it is offered being always shown by the record. If then there be no special reason in a particular case, why a rejected plea should not be ordered to be made a part of the record, and exception to its rejection be entered on the record book, I can see no reason why a court ought not to be permitted in its discretion so to do ; or why it should be uselessly required in every case, to have a formal bill of exceptions written out and signed. And this is, I think, the decision in *White* v. *Toncray*, 9 Leigh 347, and the subsequent Virginia cases, and also in *Hart* v. *B. & O. R. R. Co.*, 6 W. Va. 336.

It is true, Judge Haymond in the last case in delivering his opinion does in effect adopt the reasoning of Judge Tucker, which I think is unsound. But, as in that case the motion was to reject or more properly strike out a plea, already filed, and no entry was made on the record book, that the defendants excepted to the action of the court in rejecting the plea, the court very properly held, that no objection to the rejection of the plea could be made for the first time in this court. This decision was not properly based on the fact, that no bill of exceptions was filed, but on the fact, that no bill of exceptions was filed and no entry made on the record book, that the defendant objected to the rejection of its plea. The decision is simply, that this objection must appear to have been made in the court below, either by bill of exceptions, or otherwise, and this did not appear in any manner.

Assuming therefore, that under the decision in *White* v. *Toncray*, 9 Leigh 347, a court may order a rejected

plea to be made a part of the record, by a simple order to that effect on its order book, and then permit it to further appear by the order, that the defendants excepted to its rejection, and that the plea and exception were then both parts of the record, I am of the opinion, that this has been substantially done in this case. It is true, there is no formal entry, that the rejected pleas shall be made a part of the record; still when the court makes the order, that the pleas are rejected, and the rejection of them is excepted to by the defendants, such entry could be made by the court, only to give to the defendants the power, to have reviewed the decision of the court in rejecting the pleas. Of course this purpose of the court would be idle, unless the plea was thereby intended to be made a part of the record. For of course no exception could be taken, to what constituted no part of the record. And, it does seem to me, we would be too technical, if an entry, which the court, who made it, considered and must have considered as the equivalent of an order directing, the rejected plea to be made a part of the record, should be disregarded, simply because it did not say in express words, the rejected plea is ordered to be made a part of the record.

I am therefore of opinion, that when the order book shows, that a plea was offered and rejected, and that the defendants excepted or objected to the action of the court in rejecting the plea, such entry is equivalent to an order of the court, making the rejected plea a part of the record, and the Appellate Court can look at it, and consider the propriety of the order rejecting it; and I have accordingly done so in this case. I am confirmed in this opinion by the last paragraph of chapter 131, section 9, page 627 of the Code of West Virginia, which is an addition, there made for the first time. "Without excepting thereto," in this paragraph, I interpret, "without filing a bill of exceptions," as it is added to the section, allowing a party to file a bill of exceptions.

The appellants' counsel insist, that the record does not

show, that any replications were filed to any of the special pleas ; and that no judgment could therefore be properly rendered on the verdict. The record book, after stating the filing of the special pleas, proceeds: " And thereupon the plaintiff, by his counsel, replies generally to each of the special pleas, filed in this action." It is true, no such written replications appear in the record, which, it is insisted, is necessary. The usual practice is, not to write out a general replication, but simply to note it on the record book, as was done in this case. And if this is done without objection, after verdict, it has always been regarded as sufficient.

This practice, long established, has been approved by the Court of Appeals of Virginia, they declining to consider, on an appeal, such an objection, made in this court for the first time. It is questionable, whether it ought to be regarded as error, for which a case would be reversed, even if objection had been made in the court below. See *Ellett* v. *Vaughan,* 6 Call 77 ; *Gallego* v. *Moore*, 4 Munf. 60.

Again it is insisted, that it was an error to swear the jury, to try the issue, as the record states was done in this case, when there were several issues made, and which ought to have been tried. The verdict of the jury was responsive to all the issues ; and therefore, as this court decided in *Baylor* v. *The Baltimore and Ohio Railroad Company*, 9 W. Va. 281, the misprision, in charging the jury to try the issue, is immaterial. The same has been frequently held both in this State and in Virginia. See *Mackey* v. *Fuqua et al.*, 3 Call 19.

The only remaining question, to be considered, is, did the court err in refusing to grant a new trial, or to arrest the judgment. It is claimed, that the motion in arrest of judgment was an admission, that there is a verdict, to which no objection can be made, and that it therefore supersedes the motion for a new trial, which ought not therefore to be considered by this Court. See *Philpot* v. *Page*, 4 B. & C. 160 (10 English C. L.) The question

would have been presented, if the motion for a new trial had been made after the motion in arrest of judgment had been decided, as in that case; but the two motions were here made simultaneously; and both acted on at the same time; and both overruled.

In the case of *Sims* v. *Alderson*, 8 Leigh 479, the two motions were made simultaneously, as in this case. The court below sustained the motion in arrest of judgment, but did not act upon the motion for a new trial. The Court of Appeals reversed the judgment of the court below on the motion in arrest of judgment, and entered up judgment for the plaintiff, declining to send the cause back for the circuit court to act on the motion for a new trial, as it would be mischievous in the extreme for the circuit court or county court to act on a motion for a new trial, and to sign a bill of exceptions, setting forth the facts, after a lapse of years, and especially, as in one of these courts the application for a new trial would have to be made before a court, composed of different justices than those, who tried the case.

In this case no such difficulty exists, as the court below at the same time acted on both motions, refused them and signed a bill of exceptions certifying the facts. It is obvious, that on this state of facts the court in *Sims* v. *Alderson*, 8 Leigh 488, would have reviewed the action of the circuit court on both motions. And it seems to me clear, that the motion in arrest of judgment, made simultaneously with a motion for a new trial, was not to be regarded as admitting, that there is no objection to the verdict, as, at the same time he moved to arrest the judgment, he protests against the verdict as objectionable. We shall therefore review the action of the court on both of these simultaneous motions.

It is earnestly insisted by the appellants' counsel, that the true and only measure of damages in a suit of this character, as in all other suits for torts, is the actual pecuniary loss, which the plaintiff has sustained by reason of the wrong done; and that though courts have often

said, that in cases of this character the jury may properly give vindictive damages, as a punishment to the defendant, that is punitive damages, damages beyond the injury actually sustained, for the sake of the example, that such is not the law. We are earnestly invoked to disregard these often expressed views of the ablest jurists, as contrary to fundamental principles, and as confounding the broad line, always to be kept in view, which divides civil and criminal proceedings.

While no authorities are referred to by appellants' counsel, and none can be found to sustain his extreme view, that the plaintiff in such an action is only entitled to nominal damages, unless there be evidence of actual pecuniary injury, coupled with the proof of malicious intent, yet highly respectable jurists have insisted, that what is strictly called punitive damages ought in no civil case to be given; and the damages awarded the plaintiff should be only the damages, sustained by him through the defendant's wrong. But those, who entertain these views, are careful to say, that by the damages, sustained by the plaintiff, they do not mean the amount, to which his estate has been diminished by the wrong, that is the pecuniary loss, as the phrase is generally understood; but there is to be included in the damages, sustained by the plaintiff, full compensation for his mental and bodily suffering directly consequent on the wrong; and that, while the loss to his estate, his pecuniary loss, may be a mere trifle, the loss resulting from bodily suffering or mental agony may be very great.

As the court gave no instruction to the jury in this case, I do not deem it necessary to express any opinion, as to which of these views expresses most correctly the measure of damages in such a case. As the verdict of the jury ought not, in my judgment, to be set aside, and a new trial awarded by this court, because the damages allowed by the jury were excessive, whether we regard one or the other as the proper rule for measuring the damages. Which ever rule is adopted, it is obvious, that

1878
Special Term.
Sweeney
v.
Baker et al.

:n a suit, of the character of the case before us, the amount of damages is necessarily a subject for the exercise of a sound discretion by the jury, which discretion, from the very nature of the case, it is impossible for the court to control.

No exact standard can possibly be laid down, by which to ascertain the amount of damages in such a case. It is impossible to lay down any rule, by which, what is a just compensation for mental suffering, can be measured. It must be left to a jury to determine from all the circumstances of the particular case. The proper compensation for mental suffering and annoyance in such a case is a matter of opinion, based on the facts proven in the case. It cannot be the subject of direct testimony. A witness would not be allowed to testify, what was the injury resulting from such mental suffering; for it would necessarily be only an opinion; and the witness, so testifying, would be simply assuming the province of the jury, and determining the amount of damages, which should be awarded the plaintiff. Opinions must, from the very nature of the case, differ very greatly on such a question.

This being the case, there is almost universally, in such cases, no direct evidence of the damage, sustained by the plaintiff. And in very few cases has it been suggested, that, when the libelous allegations have been proven, or admitted to have been published by the defendant without justifiable excuse, it was incumbent on him, before he could ask a verdict for substantial damages, to prove by direct testimony such damages. When such suggestion has been made, as it has been in this case by counsel, it has always been promptly disposed of by deciding, that in such a case no actual damage need be proven, to entitled a plaintiff to recover substantial damages, such damages as, on the facts proven, the jury believe he is entitled to recover.

Thus in *Tripp* v. *Thomas*, 3 B. & C. 427, (10 Eng. C. L. R.) in action for slander for words imputing subornation

of perjury, the defendant suffered judgment by default. On the execution of the writ of enquiry, as to the amount of the plaintiffs' damage, he offered no evidence whatever; yet the jury assessed his damages at forty pounds. This verdict of the jury was sought to be set aside, on the ground that the jury could only give nominal damages, in the absence of all evidence to fix the amount; but the court refused to set aside the verdict, holding that it was unnecessary to introduce any such evidence.

So the case of *Sanderson* v. *Caldwell*, 45 N. Y. 398, was an action for libel, published by defendants in the Sunday *Mercury*. The plaintiff was a lawyer and a candidate for the Assembly; the libelous article was published two days before the election, and was as follows: "Elnathan L. Sanderson, extra-radical candidate for Assembly, did a good thing in his sober moments, in the way of collecting soldiers' claims against the government for a fearful percentage. The blood-money, he got from the 'boys in blue,' is supposed to be a big thing, and may elect him to the Assembly on the 'loyal' ticket, although the soldiers and sailors are in full force against him." No proof of loss, damage, or injury to the plaintiff, professional or otherwise, was given, and no proof of actual malice was made. The verdict of the jury was for $5,000.00 damages; and judgment was rendered thereon. The judgment was affirmed, the court saying:

"The exception to the refusal of the court to charge, that there being no proofs of malice other than that, which is implied from the publication of the article, the jury might find a verdict for nominal damages, and that such a verdict would be a vindication, was not well taken. The defendant did not attempt to justify the libel, nor were there any circumstances mitigating it, unless the fact, that the plaintiff at the time was a candidate for office, may be considered in the nature of mitigation. The plaintiff was entitled to be compensated for the injury to his reputation, caused by the wrongful publication. His

character was not impeached. In such a case, a nominal verdict would have been a denial of justice; and the court was not bound to assent to the suggestion of the defendant, that such a verdict might be given. Nor would such a verdict have been a vindication of the plaintiff. It would have established that the charge was false; but at the same time it would have left it to be inferred, that the plaintiff had no character to lose."

1871
Special Term.
Sweeney
v.
Baker et al.

This case strongly resembles the case before us, I cannot better express my views of the impropriety of the rendition of a verdict in this case for nominal damages, than by adopting the above quotation from the opinion of the court in that case. The allegations, complained of as published against the plaintiff in this case, were much more damaging to the plaintiff's character. The same pretended excuse for the publication existed in that case, as in this: that the plaintiff was a candidate for the Legislature. In that case, as in this, no proof of loss, damage or injury to the plaintiff was given, except such as the jury had a right to infer from the fact, that the publication was made. In that case no proof of actual malice was made. In the case before us this actual malice is further proven by other libelous publications against the plaintiff, made prior to this one by the defendants. In that case as in this the plaintiff's character was unimpeached by any evidence.

There is however one marked difference between the cases. In that case there was no attempt by the defendant to justify. In this case the defendants filed six special pleas, justifying most of the libelous charges published against the plaintiff, and alleging numerous facts, which if they had been proven to be true, would have shown, that the plaintiff was a man of degraded habits and character. These pleas were never withdrawn; but the counsel for the defendants in his opening speech "called attention to these special pleas, recapitulated to the jury the allegations of these pleas, and insisted, that such allegations would be proved by evidence." And

1878
Special Term.

Sweeney
v.
Baker *et al.*

yet the defendants introduced no evidence to prove them or to impeach the plaintiff's character. This, as the case already cited shows, was an aggravation of the original wrongs complained of ,in the declaration. It justified the jury in giving larger damages, than they would otherwise have given.

In addition to the authorities already cited, the following cases may be referred to, as showing, that the filing of these pleas, the entire failure to produce any evidence to sustain them, and these remarks made by the counsel on behalf of the defendants, might properly be regarded by the jury as proving malice, and as an aggravation of damages. *Richardson* v. *Roberts*, 23 Ga. 221 ; *Smith* v. *Wyman*, 16 Me. (4 Shipley) 14; *Fero* v. *Ruscoe*, 4 Com. (N. Y.) 165 ; *Updegreve* v. *Zimmerman*, 13 Penn. (1 Harris) 620 ; *Robinson* v. *Drummond*, 24 Ala. 174 ; *Beasly* v. *Meigs*, 16 Ill. 139 ; *Wilson* v. *Notions*, 5 Yerg. 211 ; *Doss* v. *Jones*, 5 How. (Miss.) 158.

Under these circumstances of aggravation the verdict in the present case was more moderate than in the case of *Sanderson* v. *Caldwell*, 45 N. Y. 399.

A new trial in such a case ought not to be granted, especially by the Court of Appeals, unless the damages assessed by the jury are so enormous as to furnish evidence of prejudice, partiality, passion, or corruption on the part of the jury. *Spencer* v. *McMasters et ux*, 16 Ill. 405 ; *Coleman* v. *Southwick*, 9 Johns. 51 ; *Southwick* v. *Stevens*, 10 Johns. 444 ; *Treanon* v. *Donahoe*, 9 Cush. 228 ; *Moody* v. *Baker*, 5 Cow. 351 ; *Highmore* v. *Harrington*, 3 J. Scott N. S. 143 (91 Eng. C. L. R.); *Gilbert* v. *Burthenshaw*, 1 Cow. R. 230; *Neal* v. *Lewis*, 2 Bay (S. C.) 204.

The various authorities, cited on this point by the appellants' counsel, have been carefully examined and considered by me. They are generally cases for other torts than libel and slander : and in nearly all of them, where new trials were granted, there were facts proven, which ought to have mitigated the damages. But little light on this subject can be gained from an exami-

nation of decided cases, as might be anticipated, the circumstances surrounding each case, and the infinite diversity of torts render the cases so unlike, as to furnish no guide. All that can be done is, to deduce from the cases some general principles as our guide; and this we have endeavored to do.

The principle, I have deduced, as above stated, when applied to this case, leads my mind to the conclusion, that it is not a case, which justifies this Court in reversing the action of the court below, and granting a new trial, because of the excessive damages, allowed by the jury. The amount of the damages furnishes to my mind no evidence, that the jury in assessing them were influenced by passion, partiality, corruption or prejudice.

Nor do the affidavits in the case show such misconduct on the part of any of the jury, as would have justified the circuit court, on that account, to have set aside the verdict and awarded a new trial. The evidence on this question in the record is of a very unsatisfactory character. The Acts of 1872, chapter 47, §23, provide: "That the court shall, on motion of either party in any suit, examine on oath any person, who is called as a juror therein, to know whether he is a qualified juror, or related to either party, or had any interest in the cause, or is sensible of any bias or prejudice therein; and a party, objecting to the juror, may introduce any other competent evidence in support of the objection, and if it shall appear, that such person is not a qualified juror, or does not stand indifferent in the cause, another shall be called and placed in his stead; and in every case the plaintiff and defendant may challenge four jurors peremptorily."

The jury were sworn on Monday the 15th day of May, 1876. The affidavit of Justice Schultz, the principel witness for the defendants on their application for a new trial, was made only one week afterwards. At that time there must have been a large number of persons, who could have proven clearly and positively, whether

or not the defendants, under the provision of the Acts of the Legislature had called on the court to examine the juror, Saunders, to know, whether he was sensible of any bias or prejudice in the case ; and if he had been so examined, there could have been no difficulty in proving clearly, what his answers were to such enquires. Yet this was not done. No witness speaks on this subject at all, except one of the defendants, James B. Taney ; and he only speaks of it in his affidavit in this vague manner: "The affiant and the other defendants supposed him to be a fair and impartial juror, from the fact of his being examined under oath touching his fitness as a juror; and they had no other belief in relation to said juror until after the trial of this cause."

Justice Schultz in his affidavit says, that on the same day, that the juror, Saunders, was sworn on the jury, he said to him on this subject : "I don't see the reason, why the judge did not ask me, whether I had formed an opinion." And Stroble in his affidavit, made fifteen days after the jury was sworn, says, that in the conversation with Justice Schultz, after the verdict was rendered, the juror, Saunders, said : "That the judge had not asked him, whether his mind was made up or not. In reply Squire Schultz asked him, if the judge did not ask him, if he was biased or prejudiced. Saunders said he did not, or if he did, he (Saunders) did not hear it, or he did not understand it." And yet Justice Schultz, though he made two affidavits at different times, does not in either of them say, that any question was asked, at the time the juror, Saunders, was sworn, whether he was biased or prejudiced. If any such question was asked of the juror, Saunders, and he answered, that he stood indifferent in the cause, the conduct of Justice Schultz on the occasion would have been most reprehensible, if it be true, that the juror Saunders had really said to him only two days before, "that they could not use him in that case, as he had his mind made up on that subject, or words to that effect." If this had been so, it would have been strange in-

deed, when Saunders swore he was indifferent in the cause, and if he did so swear, that Justice Schultz did not then inform the counsel for the defendants, who were but a few feet from him, that this oath of Saunders was false, as he had told him otherwise but two days before. I cannot believe that Justice Schultz would have sat by, and seen the juror, Saunders, make this false oath, and take his seat on the jury without mentioning it to the counsel in the cause, that he was unfit to sit on the jury. It is more just to Justice Schultz to believe, that when he kept silent in reference to this juror, it was, because he did not suppose him then unfit to sit upon the jury.

1878
Special Term.

Sweeney
v.
Baker *et al.*

Fairness to all the witnesses induces me to believe, that the real facts were, that there was a conversation between the juror, Saunders, and Justice Schultz in his office, two days before Saunders was sworn as a juror, in reference to some work, he wanted Saunders to do for him; and that in this conversation something was said about this case, and the probability of Saunders, who was of the regular jury panel, being called to be one of the jurors in the trial of the case, which was expected to be called on the Monday following, two days subsequent, this being Saturday. I believe this, because it was sworn to by Justice Schultz and his constable, Combs, and because the juror, Saunders, admits this conversation, though he has no recollection, that this particular case was mentioned in the conversation.

But I do not believe, that in this conversation Saunders said, that he could not sit on the jury in this case, because his mind was made up. I do not believe this, because the juror, Saunders, positively denies it on oath. And if this were the fact, we could only consider this denial as deliberate perjury. It is impossible to explain this denial, by supposing he had forgotten, that he had said this, because he swears " he did not know anything about the nature of the suit then, nor until he was sworn on the jury, and did not make up his mind upon it, till the case was given to the jury." And if this be not true,

he must have sworn deliberately to a falsehood. The probability is, that, in this conversation on Saturday, something was said about the trial of this case, expected to be commenced on the following Monday; but that there was no expression by the juror, Saunders, of any decided opinion on the merits of the case; and what was said made no decided impression on the mind of Justice Schultz or his constable, Combs; and when a week afterwards they swore, that Saunders had then said, he had made up his mind, and could not sit as a juror, they had forgotten, exactly what had been said, or what impression it made on their minds at the time.

I am forced to this conclusion by the conduct of Justice Schultz, when Saunders was sworn as a juror only two days afterwards. His conduct can only be explained, consistently with his honesty, by believing, that nothing which was said in this conversation on Saturday, had then left on his mind the impression, that the juror, Saunders, had made up his mind on the merits of the case, and was unfit to sit as a juror. If this had been really so, Justice Schultz's conduct in not telling the parties of it, when Saunders was about being sworn as a juror, but keeping it to himself till after the verdict, would have been fraudulent and dishonest. I prefer to believe, that he was thus silent, when Saunders was sworn as a juror, because he had then no impression on his mind, that Saunders was unfit to sit on the jury, and that when he swore otherwise some weeks afterwards, it was because the impression made on his mind by the conversation, being slight, had passed away.

I do not consider, that the statement made by Saunders after the trial, that he valued his reputation at $6,000,000.00, as at all material. He says, he said it jocularly, and the remark was obviously of that character. The affidavit of White, that the juror Peppers had said, "that had it not been for the fact that Johnston and Taney were defendants, the jury would have found a much larger verdict than they did, or words to that effect," is

obviously no ground for setting aside the verdict; and it has not been even relied on by counsel for the appellants in this Court.

The affidavits of Saunders and of James B. Taney, one of the defendants, show clearly, that the juror, Saunders, had no prejudice of any kind against any of the defendants; and that he was entirely unacquainted with any of them. He obviously did not want to sit on the jury, as he wanted, while the case was going on, to be at work for Justice Schultz; and if he had been really unfit to sit on the jury, no reason is disclosed by the records for his concealing at the time, that he was called as a juror, the fact, that he had made up his mind, and was therefore unfit to be a juror. I conclude that such was not the fact; and of course his sitting on the jury was no ground for setting aside the verdict.

Numerous decisions in other States are referred to by counsel. I have examined them all. They show, that in some of the States the courts are much more liberal in setting aside verdicts for disqualifications in one of the jurors, than they are in this State, or in Virginia. But in none of them, do I suppose, that in such a case as the present the court would set aside a verdict, upon the facts proven in this case. Certain it is, that the decisions of the Court of Appeals of Virginia and of this State show clearly, that the verdict in such a case as this ought not to be set aside on such ground. There is nothing on the record, which shows, that the defendants have been prejudiced by Saunders being on the jury. It is true, James B. Taney in his affidavit does say, "affiant is informed and believes that the defendants have been prejudiced in the trial of said cause by said Saunders being on said jury." But who gave him this information, or what information he had received, on which he bases this belief does not appear; and I presume that he bases this belief on the affidavits in the cause, or information of the facts, contained in these affidavits; and they justify no such belief.

The decisions in Virginia and West Virginia show, that here the courts regard with extreme jealousy, all attempts to set aside verdicts on the ground of objections to jurors, existing before they were sworn. Here a verdict will not be set aside for any such cause, unless it appears to have operated, so as to inflict injustice. See *Smith's case*, 2 Va. Ca. 51; *Poore's case*, 2 Va. Ca. 474; *Kennedy's case*, 2 Va. Ca. 510; *Brown's case*, 2 Va. Ca. 516; *Hughes's case*, 5 Rand. 55; *Jones's case*, 1 Leigh 598; *Hartstock's case*, 2 Gratt. 564; *Heath's case*, 1 Rob. R. 735; *Curran's case*, 7 Gratt. 609; *Dilworth's case*, 12 Gratt. 689; *Bristow's case*, 15 Gratt. 634; *Thompson* v. *Updegraff et al.*, 3 W. Va. 629; *State* v. *McDonald*, 9 W. Va. 456; *Zickafoose* v. *Kuykendall*, 12 W. Va. 23.

In the case of *The State* v. *McDonald*, "one Chamberlain, a member of the jury for the trial of the prisoner, was a member of the grand jury that framed the indictment; and this fact was not known to the prisoner or his counsel until after the verdict was rendered. This juror stated on his *voir dire* that he had made up, and expressed no opinion, as to guilt or innocence of the prisoner, and that he had not been on the grand jury, that found the indictment, thus showing himself to be a qualified juror. After the verdict was rendered, the fact, that Chamberlain had been on the grand jury, was discovered. The State made no attempt to explain the reason, why the juror so acted or swore; but as it did not appear, that his, Chamberlain's, serving on the jury caused injustice to be done to the prisoner," this court, even in this case, felt compelled by the current of Virginia cases, rendered before our separation, and therefore binding on us as authorities, to refuse a new trial, asked on this state of facts.

Certainly in that case far stronger reasons for asking a new trial existed, than in this. Here the evidence does not satisfy my mind, that the juror had at any time before the trial formed or expressed a decided opinion on the merits of the case. There the juror had unquestion-

ably formed an opinion after hearing the evidence on oath, or part at least of it, and had also stated, that he had not done so, when called upon to answer on his *voir dire* as a juror. It is obvious, that if any respect is to be paid to the Virginia decisions or to the decisions of our court, we must hold, that the circuit court did not err in refusing a new trial in this case, because of the supposed unfitness of Saunders as a juror.

On the question, whether the circuit court ought not to have arrested the judgment, we have already considered all the grounds, on which such arrest could be urged; and find no reason for reversing the action of the circuit court, in refusing to arrest the judgment.

We have considered all the assignments of error, alleged in the petition for the appeal, or in the argument of counsel. It was argued by appellee's counsel, that we ought not to consider any error, urged in the argument, which had not been assigned in the petition for the appeal; and numerous decisions of other States are cited to sustain this position. The Constitution of this State, of 1872, Article 8, § 5, provides: " When a judgment or decree is reversed, or affirmed by the Supreme Court of Appeals, every point, fairly arising upon the record of the case, shall be considered and decided." Under this provision it has been our constant practice to consider all points, fairly arising upon the record, whether assigned in the petition for an appeal or not, and we have followed this practice in this case.

There being no error in the record, for which the judgment of the circuit court of Ohio county of July 18, 1876, should be reversed, it must be affirmed; and the defendant in error must recover of the plaintiffs in error his costs expended in this court, and damages according to law.

The other judges concurred.

JUDGMENT AFFIRMED.